**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 18 C 4785** |
| **UNITED CARPET, INC., an Illinois corporation, and GREAT NORTHERN FLOORING, INC., an Illinois corporation,** | ) ) ) ) | **Magistrate Judge Finnegan** |
| **Defendants.** | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The plaintiffs, which are pension and health and welfare funds (the "Trust Funds") related to the Chicago Regional Council of Carpenters (the "Union") filed suit against Defendants United Carpet, Inc. ("United") and Great Northern Flooring, Inc. ("GNF") seeking to recover fringe benefit contributions purportedly owed in years 2016 and 2017 under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* United, formed by Gaetano ("Nino") Turi and Nicola ("Nick") Desario to perform commercial and residential flooring installation work, has long been a signatory to a collective bargaining agreement with the Union. The Trust Funds allege that Nino and Nick formed GNF as a sham non-union flooring company so they could employ United's union workers without paying them union wages and fringe benefits. The Trust Funds also allege that for flooring projects requiring union labor, GNF used United as a pass-through company, allowing GNF to obtain union work without having to sign an agreement with the Union. Defendants deny that GNF is a sham entity and insist they do not owe the Trust Funds any amounts under ERISA.

Currently before the Court are the parties' cross-motions for summary judgment. The Trust Funds argue that the undisputed facts demonstrate United and GNF are both liable for paying ERISA benefits given their status as a single employer or alter ego of each other. Defendants argue the undisputed facts show the opposite so judgment should be entered in their favor. For reasons stated here, the motions are both denied.

## BACKGROUND

### A.    The Plaintiff Trust Funds

The Trust Funds are multi-employer funded trusts that provide pension, welfare, training and promotional benefits to Union members and their families. (Doc. 33 ¶ 1). Each individual Trust Fund is organized, administered and governed according to the terms of a corresponding trust agreement (collectively, the "Trust Agreements"). (*Id.* ¶ 2; Doc. 33-1, at 5-239). The Trust Funds are also administered according to the terms of the Area Agreement negotiated between the Union and participating employers' representatives. (Doc. 33 ¶ 3). The Area Agreement relevant to this case was in effect from June 1, 2014 through May 31, 2019. (Doc. 33-1, at 241-81).

Under the terms of the Trust Agreements and the Area Agreement, an employer bound by the Area Agreement was "obligated to pay fringe benefit contributions to the Trust Fund for the hours worked by union employees and employees performing bargaining unit work." (Doc. 33 ¶ 6). A Board of Trustees selected by management and labor was charged with collecting and managing contributions from employers bound by the Trust Agreements and the Area Agreement. (Doc. 33 ¶ 4).

**B.    The Defendant Flooring Companies**

United and GNF are both engaged in commercial and residential floor installation work, focusing specifically on carpet and vinyl flooring tile.  United has been in business since 1995 when Nino Turi and Nick Desario formed the company and became equal owners.  (*Id.* ¶¶ 12, 34).  On June 17, 1996, United signed a collective bargaining agreement with the Union agreeing to make monthly fringe benefit contributions for "hours worked by union employees and employees performing bargaining unit work."  (*Id.* ¶¶ 5, 6, 15; Doc. 36 ¶¶ 1, 2).  Nino bore primary responsibility for the day-to-day operations of United, including controlling payroll, paying bills, managing the accounts, and performing administrative duties, though Nick assisted with these tasks.  (Doc. 36 ¶ 3).  Both men also performed flooring installation work as union carpenters, and hired workers for the company (*id.* ¶¶ 3, 5), though Nino resigned from the union in 2010, and Nick resigned in 2011 or 2012.  (Doc. 33 ¶ 30; Doc. 33-1, at 498, N. Desario Dep., at 34).

GNF, which does business as Accurate Flooring, was formed on or about June 15, 2009.  (Doc. 33 ¶ 16; Doc. 36 ¶ 24; Doc. 34-1 ¶ 24).  At the time of formation, Nino's wife Anita Turi and Nick's wife Katerina Desario each owned 50% of the company.  (Doc. 33 ¶¶ 11, 16).  GNF is not a signatory to the Trust Agreements or Area Agreement and is not a union company.

In 2010, Nino Turi resigned from the union and transferred his 50% ownership interest in United to his wife, Anita, making her a 50% owner of both United and GNF.  (*Id.* ¶ 13; Doc. 36 ¶ 34).  Consistent with that transfer, the Schedule K-1 forms attached to United's tax returns from 2010 through 2017 identified Anita Turi and Nick Desario as 50% owners of the company.  (Doc. 33 ¶ 14; Doc. 33-1, at 614-26).  At their depositions,

Anita and Nick testified that after this lawsuit was filed, they discovered that the tax returns for 2015, 2016, and 2017 are inaccurate because they fail to reflect that Anita sold her shares of United to Nick in 2014, making him the 100% owner of the company. (Doc. 35-1 ¶ 2; Doc. 34-1 ¶ 20; Doc. 33-1, at 533, N. Desario Dep., at 174-75; Doc. 33-1, at 385-86, A. Turi Dep., at 71-74). Defendants have not submitted any documentation reflecting this transfer.

Instead, they cite to their own deposition testimony and that of their accountant, Patrick Noone of PJN Financial Services, who stated that he prepared amended tax returns for 2015, 2016, and 2017 to reflect the change in United's ownership.[1] (Doc. 33-6, at 7, 23, Noone Dep., at 4, 69). Noone did not know whether the amended tax returns had ever been filed. Though unfiled and unsigned versions of the amended tax returns were offered as exhibits at the depositions of Anita Turi and Nick Desario in early 2019, Defendants have not produced copies of those amended tax returns in connection with the cross-motions for summary judgment or provided evidence of their filing. (*Id.* at 23, Noone Dep., at 70; Doc. 33-1, at 385, A. Turi Dep., at 71; Doc. 33-1, at 534, N. Desario Dep., at 178-81).

As discussed in more detail below, the parties dispute the nature of the roles Nino Turi and Nick Desario played at United and GNF from 2010 onward, and the extent of their involvement in the companies.

## C.    The January 2018 Audit and Resulting Lawsuit

In January 2018, the Trust Funds retained Legacy Professionals, LLP ("Legacy") to conduct an audit of United's fringe benefit contributions for the period January 1, 2016

---

[1]    A third cite to Nino's deposition has no bearing on this issue. (Doc. 33-1, at 593, G. Turi Dep., at 117) (discussing hiring at United).

through December 31, 2017. (Doc. 33 ¶ 8). In the course of that audit, Legacy identified GNF, a non-signatory to the fringe benefit agreements, as a related company and obtained records from GNF to assist with the audit. (*Id.*; Doc. 33-1, at 292). In its January 24, 2019 Audit Report, Legacy identified a number of "common elements" between United and GNF, including common ownership and shared office space. (Doc. 33 ¶ 9; Doc. 33-1, at 292).

Based on the common elements and its review of relevant records, Legacy concluded that United had underpaid fringe benefit contributions to the Trust Funds for the period January 1, 2016 through December 31, 2017 in the amount of $939,094.71. This figure is based on 30,645 hours worked by 13 employees for whom United had previously paid fringe benefits but who were paid during the audit period by GNF without benefit contributions (Francisco Acosta, Martin Bahena, Pete Caucci, Jose Antonio Cruz, Juan Carlos Cruz, Pietro Desario, Mark Jones, Dan Lerma, Daniel Monico, Alejandro Navarro, James Nelson, Mario Salazar, and Nick Torina). (Doc. 33 ¶ 10; Doc. 33-1, at 293, 297-300). The Trust Funds say all of these employees worked for United "[e]ither during the audit period or prior to the audit period," and United reported fringe benefits contributions for them. (Doc. 33 ¶ 35). In this lawsuit, the Trust Funds seek to recover the unpaid contributions, as well as interest, liquidated damages, auditor's fees, and attorneys' fees.

## DISCUSSION

### I.    Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). *See also Chicago Regional Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1356 (N.D. Ill. 2016). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On cross-motions for summary judgment, the Court "construe[s] all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 824 F.3d 645, 647-48 (7th Cir. 2016) (internal quotations omitted).

## II.    Single Employer

The Trust Funds argue that United and GNF are sufficiently integrated to be treated as a single entity under the single employer doctrine. *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998). This would make both companies "equally liable under a collective bargaining agreement entered on behalf of only one of them." *Board of Trustees of the Pipe Fitters Retirement Fund, Local 597 v. American Weathermakers, Inc.*, 150 F. Supp. 3d 897, 905 (N.D. Ill. 2015) (citing *Moriarty*, 164 F.3d at 332). "To determine whether two nominally separate business entities are a single employer, one must examine four factors set out by the Supreme Court: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Lippert Tile Co. v. Int'l Union of Bricklayers and Allied Craftsmen, Dist. Council of Wis. and its Local 5*, 724 F.3d 939, 946 (7th Cir. 2013). *See also Chicago Regional Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, 404

(7th Cir. 2016).  No single factor is conclusive; instead, courts "must weigh the totality of the circumstances." *Lippert Tile*, 724 F.3d at 947.  "Ultimately, single employer status . . . is characterized by the absence of an arm's length relationship found among unintegrated companies." *Cremation Society of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (quoting *Lippert Tile*, 724 F.3d at 947).

### A.    Common Ownership

 "Common ownership typically applies when two companies are owned by the same individual(s)." *Fox Valley & Vicinity Construction Workers Welfare Fund v. Morales*, No. 17 C 416, 2019 WL 247538, at *3 (N.D. Ill. Jan. 17, 2019).  The Trust Funds argue there is "evidence of actual common ownership because Anita owned 50% of both United and GNF." (Doc. 32, at 13).  But Anita's 50% ownership of United in the relevant years is in dispute.  The Trust Funds point to tax returns for years 2010 through 2017 reflecting Anita as 50% owner of United.  (Doc. 33 ¶¶ 13, 14; Doc. 36 ¶ 34; Doc. 33-1, at 614-26). Anita and Nick Desario both testified, however, that Anita sold her shares of United to Nick in 2014, and so the tax returns from 2015, 2016, and 2017 are inaccurate.  (Doc. 33-1, at 533, N. Desario Dep., at 174-75; Doc. 33-1, at 385-86, A. Turi Dep., at 71-74). Accountant Patrick Noone testified that he was asked to prepare (and did prepare) amended tax returns for 2015, 2016, and 2017 to reflect that Nick was the sole shareholder of United during those years.  (Doc. 33-6, at 15-16, Noone Dep., at 39-40). It is certainly suspicious that Anita purportedly transferred her ownership to Nick in 2014, and yet the tax returns never reflected this in more than three successive years, with the error only being discovered after this litigation began.  But this Court may not weigh the evidence or make credibility findings at this stage of the litigation.

The Trust Funds correctly note that the record does not reflect whether the amended returns prepared by Mr. Noone were ever filed. While true, this does not allow the Court at the summary judgment stage to disregard the testimony of Anita and Nick and find that the transfer never occurred and so common ownership existed in the years in question. This Court is also not persuaded that Defendants are estopped from offering testimony of Anita and Nick concerning her sale of the United shares in 2014 because the tax returns that were filed continued to reflect Anita as 50% owner in subsequent years. (Doc. 37, at 11). In support of this position, the Trust Funds cite only to the findings of fact and conclusions of law issued in *Central States, Southeast and Southwest Areas Pension Fund v. One Stop, Inc.*, No. 03 C 4414, 2007 WL 7705585 (N.D. Ill. July 18, 2007), following a bench trial. The pension fund in *One Stop* argued that the defendant was responsible for making withdrawal liability payments on behalf of another company because the two entities constituted a single employer. The only question at trial was whether One Stop was operating as a trade or business (a convenience store) during the relevant years. *Id.* at *11 (citing 29 U.S.C. § 1301(b)(1)).

One Stop argued that it had ceased all convenience store operations in 1999, but its tax returns for 2000, 2001, and 2002 showed significant income and expenses typically associated with operating a convenience store. *Id.* at *3, 6, 13. Moreover, One Stop took advantage of the tax benefits of operating as a trade or business by claiming deductions for its expenses. *Id.* at *13. The court rejected One Stop's assertion that the tax returns were inaccurate, finding the position both not credible and also barred under the doctrine of quasi-estoppel. *Id.* at *6, 13. As the court explained, since One Stop had accepted tax benefits when it filed the returns (i.e., decreases in its tax liability), it could not "disavow

8

those very same tax returns" to avoid the "corresponding obligations or effects" (i.e., withdrawal liability). *Id.* at *13 (citing *Matter of Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991) (where taxpayer took tax deductions for alimony payments made to his ex-wife, he could not subsequently claim in bankruptcy that the payments were mere property settlements); *In re Robb*, 23 F.3d 895, 898 (4th Cir. 1994) (same)).

Here, it is not clear what benefit Defendants received from the tax returns showing Anita was a 50% owner of United in 2015, 2016, and 2017, and the Trust Funds have not provided any evidence in that regard. In addition, unlike in *One Stop* where the court explicitly considered the credibility of the witnesses at trial, this Court cannot make credibility determinations concerning Anita and Nick's testimony on summary judgment. At this stage of the proceedings, the Trust Funds' estoppel theory is insufficient to eliminate the disputed issue of Anita's ownership of United during the relevant years.

The Trust Funds also argue there is evidence of common ownership through the husband-and-wife relationship between Nick, who owns 50% (or possibly 100%) of United, and Katerina, who owns 50% of GNF. (Doc. 32, at 13) (citing *Suhadolnik v. U.S.*, No. 10-3021, 2011 WL 2173683 (C.D. Ill. June 2, 2011)). In *Suhadolnik*, however, it was not the familial relationship that supported a finding of common ownership. Rather, it was evidence showing that the husband was a *de facto* owner of his wife's company for tax purposes because he: had the authority to collect and pay trust fund taxes; hired employees and determined their salaries; set the company's financial policies; led weekly meetings where tax issues were discussed; reviewed balance sheets and income tax returns; prioritized expenses; and was a signatory on the company's bank accounts.

9

2011 WL 2173683, at *6.  Accordingly, the Court cannot find based simply on the husband-wife relationship that common ownership existed.

In sum, on the record presented and given the disputed facts and need for the Court to weigh the evidence and make credibility findings, the common ownership factor does not tip either in favor of or against a finding that United and GNF are a single employer.

## B.    Interrelation of Operations

In assessing the next factor, interrelatedness of two companies' operations, "day-to-day operational matters" are most relevant.  *TMG Corp.*, 206 F. Supp. 3d at 1357 (quoting *Lippert Tile*, 724 F.3d at 947).  Among other factors, courts have considered "whether purportedly separate businesses shared the maintenance of their business records, processed payroll jointly, processed their billing and bank accounts together, and shared space."  *Id.  See also Midwest Operating Eng'rs Fringe Benefit Funds v. Sulzberger Excavating Co.*, No. 16 C 4209, 2017 WL 4074018, at *6 (N.D. Ill. Sept. 14, 2017) ("Interrelated operations include companies that operate out of the same building, use the same employees, have the same organizational chart or management, operate in the same geographic market and industry with the same or similar customers, share computers and phone numbers, use the same bank accounts, or use the same payroll and billing entity.").

There is some undisputed evidence in the record indicating that United and GNF have a high degree of interrelation of operations.  To begin, both companies perform the same type of work (flooring installation) in the same geographic area.  (Doc. 33 ¶ 34).  *See, e.g., Lippert*, 724 F.3d at 947 (finding interrelation of operations where, among other

things, both companies "served the same geographic area and performed the exact same labor."). It is true that GNF opened a showroom and sought to sell carpeting to homeowners and other customers in addition to doing installation work, while United focused solely on installation. Yet Defendants do not rely on this fact to distinguish the two companies and instead claim that the customer segments differ because United performs only union work while GNF performs only non-union work.[2] (Doc. 34, at 7). Actually the evidence shows that GNF bid for union work, and Nick (United's owner) testified that he sometimes assisted in preparing those bids as a volunteer for GNF and later as a paid employee of GNF. If GNF won the bid, Defendants claim it then entered into a subcontract with United to perform the installation work. Moreover, records demonstrate that both companies share common employees: GNF hired 13 current and former United employees to work on GNF jobs. (Doc. 33 ¶ 31). *See, e.g., Morales*, 2019 WL 247538, at *4 ("Bravo and Morales went so far as to share employees and shift them from one company to another depending on which had work. On these facts, no reasonable fact finder could find that the two companies conducted their day-to-day operations separately.").

Defendants respond that the workers were hired as independent contractors "and had left the union for years before starting to work for GNF." (Doc. 35-1 ¶ 5, citing Doc. 33-1, at 604, G. Turi Dep., at 161; Doc. 38, at 16-17). The cited testimony from Nino Turi, however, says only that Peter Caucci was an employee of GNF in 2016 and 2017. Moreover, there is no evidence regarding the other workers to support the assertion that

---

[2]    Defendants also claim that United did mostly commercial jobs, whereas GNF "focused solely" on residential jobs. (Doc. 38, at 9). This ignores evidence, discussed in more detail below, that GNF worked on a variety of commercial projects, including several credit unions, a bank, and an administration building. (Doc. 33 ¶ 46).

they were employed as independent contractors by GNF and long after leaving the union. To the contrary, payroll records demonstrate that GNF issued paychecks to, withheld payroll taxes for, and issued W2 forms to all 13 individuals identified in the January 2018 Legacy audit for work performed from 2015 through 2017. (Doc. 33-3, at 2-23, 74-156, 192-272, 324-422). For those same years, United issued paychecks to, withheld payroll taxes for, and issued W2 forms to three of those same employees: Mark Jones, James Nelson, and Pietro Desario.[3] (Doc. 33-3, at 2-23, 48-72, 158-190, 274-322; Doc. 33 ¶¶ 36-41; Doc. 33-2, at 161-68). Since United hires only union labor, these three workers at a minimum must have been union members throughout that period. (Doc. 33-3, at 29, M. Jones Dep., at 15, "I am a member of the Carpenters Union.").

Nevertheless, it is unclear how much weight to give the fact that three carpenters worked for both companies in the same time period, and a number of others worked at different times for both companies. While Mark Jones testified that he worked both for GNF and United during the same period, he also suggested it was not unusual for union carpenters to work for multiple companies, sometimes by getting on a list with the union hall. (Doc. 33-3, at 39, Jones Dep., at 54) ("Same way if you put your name in the union hall. If you put your name down there, it's the same way. They call you on the phone and they say hey. It could be any -- any union shop could call you on the phone at any given time and say, hey, do you want to go do this job. We have a job for you. You can say yes, I'll go do it, and then in that case I would ask Nino for some time off to go do the union job because I would like to try to keep, you know, some benefits going on the union

---

[3]     Peter Caucci was similarly paid by both companies in January 2016. (Doc. 33 ¶¶ 42, 43; Doc. 33-3, at 435, Caucci Dep., at 44, "Q. So my question is . . . did your employment with United Carpet, Inc. and Great Northern Flooring, Inc. overlap? A. Yes. At times.").

side.").  This factor of common employees would appear to deserve greater weight if they were full-time employees and worked only for the two companies alleged to be a single employer.  It is not entirely clear if that is the situation here for the overlapping employees.

Several other factors weigh more clearly in favor of a conclusion that United and GNF are interrelated in their operations.  For example, Nick Desario "holds an office" at GNF, (Doc. 38, at 15), and United has not had any independent office space since 2010 when GNF was formed.  (Doc. 33 ¶ 78) (undisputed that United has no storage space, warehouse space, commercial location from which it operates, website, email services, office staff, or suppliers).  *See TMG Corp.*, 206 F. Supp. 3d at 1357 (companies interrelated based in part on fact that signatory company "never had a permanent, stand-alone office; instead it opted to operate primarily out of [the non-signatory's] construction offices.").  In addition, United and GNF "share the same attorney, accountant, registered agent, insurance company, bank, and payroll service." (Doc. 32, at 11).  *See TMG Corp.*, 206 F. Supp. 3d at 1357 (finding interrelation of operations where, among other things, the signatory and non-signatory companies "shared the same attorney for filing their annual reports; they shared the same registered agent; they maintained bank accounts at the same time at the same banks; and they used the same insurance broker.").  More specifically, both companies used Morris Dyner as their attorney before switching to Burton Brown, who now represents both companies in this lawsuit.  (Doc. 33 ¶ 59).  United and GNF also used the same accountant, Donald Piorek of AccounTax Business Services, until they both switched to Keith Orr of Tighe Kress & Orr, P.C., and then to Patrick Noone of PJN Financial Services.  (*Id.* ¶ 60).  Piorek served as the registered agent for United and GNF in 2010, 2011, and 2012, at which point Dyner became the

13

registered agent for both entities from 2013 through 2017. (*Id.* ¶ 61). Similarly, United and GNF both use Orazio Difruscolo as an insurance agent, and Country Financial as a Workman's Compensation insurer. (*Id.* ¶ 64).

Furthermore, United and GNF both use the same banking institution and use Paycor as a payroll service provider. (*Id.* ¶ 63). Though each company has separate login credentials with Paycor, (Doc. 35-1 ¶ 11), from 2015 through 2017 the payroll invoices and W2 summaries for both companies were addressed to Katerina Desario at GNF's business address in Bensenville, Illinois. (Doc. 33 ¶¶ 57, 58; Doc. 33-5, at 26-29, 47-49; Doc. 33-2, at 161-68; Doc. 33-3, at 2-23). *See TMG Corp.*, 206 F. Supp. 3d at 1357 (fact that signatory company "had some of its mail sent to [the non-signatory's] headquarters and addressed to the attention of [the non-signatory's] employees" supported a finding of interrelated operations). Notably, Katerina was an owner and officer of GNF with no official connection to United, but she was a signatory on United's bank account and signed at least one check on that company's behalf. (Doc. 33 ¶ 49; Doc. 33-4, at 34) (5/25/2016 United check to the Secretary of State signed by Katerina). *See TMG Corp.*, 206 F. Supp. 3d at 1357 ("When one company controls the ability of another to issue checks, that is an intertwined relationship, not an arm's length relationship.").

Like Katerina, Susan Stricklin (a/k/a Fry or Martin), who was president of GNF from 2009 through fall 2014, oversaw matters for United during those years. For example, United and GNF both told Paycor to name Susan Fry as their designated "Primary Contact" and "Paygroup Contact." (Doc. 33 ¶¶ 24, 57, 58; Doc. 33-5, at 21-22, 40-43). During workers' compensation insurance audits of United in 2011 and 2012, Susan

14

Stricklin was named as the company's contact person.[4]  (Doc. 33 ¶¶ 55, 56).  And during a 2013 audit of United's fringe benefit contributions, Stricklin served as Legacy's primary contact.  Using an email signature with "United Carpet Inc.," Stricklin responded to Legacy's requests, made arrangements with United's accountant to produce its records, and gathered United's invoices at the accountant's request.  (*Id.* ¶¶ 52, 53).  When Legacy asked for documents related to Accurate Flooring (the d/b/a of GNF), however, Stricklin advised the auditor that Nino Turi owned that company and would need to be contacted directly.  (*Id.* ¶ 54).  It does not appear that Stricklin revealed her role as GNF's president, which the Trust Funds view as an effort to conceal the relationship between GNF and United.  (Doc. 32, at 8).

Against this evidence, Defendants claim that: (1) United and GNF "maintain separate business records and receive their respective corporate documents in separate folders or envelopes"; (2) United is not "wholly dependent on Great Northern for it to survive" and has performed subcontracting work for other companies, including Tandem Flooring, Floor and Wall, and Key Carpet; and (3) United and GNF have a verbal agreement that GNF will subcontract United to do any union work, and there are subcontractor agreements to that effect.  (Doc. 34, at 7; Doc. 34-1 ¶ 8; Doc. 36 ¶ 8; Doc. 33-1, at 514, N. Desario Dep., at 100-01).  Defendants cite no factual authority for the first proposition regarding maintenance of business records in separate folders.  A reasonable factfinder, however, could determine that the second and third propositions support a finding that United and GNF are not a single employer.  If United enters into agreements

---

[4]    The 2012 insurance audit was "performed at insured's [United's] other business location at 1132 Tower Ln, Bensenville, IL 60106," which was GNF's business address at the time.  (Doc. 33-5, at 13; Doc. 33 ¶ 56; Doc. 36, at 20 ¶ 6; Doc. 33-1, at 431, K. Desario Dep., at 101).

to provide union labor for other non-union companies and not just GNF, then it could more easily be viewed as a separate company from GNF that is engaged in a different line of work, namely, serving as a supplier of union labor for non-union companies that have opportunities to perform contracts requiring union laborers.

The Trust Funds stress that GNF promotes on its website that it performed the labor on projects for which United actually performed the labor, suggesting that United and GNF operate as a single employer. For example, regarding a Meadows Credit Union project, GNF posted on Facebook: "A great job by Great Northern Flooring. Supplied and Installed." (Doc. 33 ¶ 70). Similarly, after completing a project at the Verizon store at Ogilvie Station, GNF posted on Facebook: "Ogilvie station Verizon done by Great Northern Flooring!" (*Id.* ¶ 74). The Court requires more evidence in order to determine the significance of these Facebook posts, however, since Defendants claim United performed the labor on these projects on behalf of GNF under a subcontract and the record includes evidence that United submitted invoices to GNF for the labor performed on GNF projects. (Doc. 33 ¶¶ 71-74; Doc. 34-1 ¶ 8). It is unclear whether it is unusual in the industry for the company that won the bid and fulfilled the customer's contract to take credit for and publicize the successful project even though a subcontractor performed the installation. At trial, the parties will have an opportunity to provide additional evidence on the custom in the industry (e.g., did Key Carpet and other companies that reportedly used United for installation work similarly tout the work on such projects in their own marketing materials or publicize United's work as their own?) so the Court is able to decide what weight to give these Facebook posts.

The Trust Funds finally note that United did not include any profit component in the invoice to GNF for labor performed on the Meadows Credit Union project. (Doc. 33 ¶¶ 71, 72). United similarly submitted an invoice to GNF for work done on the Ogilvie Station project that reflected only charges for the cost of performing the labor on this project—including wages and fringe benefit contributions—with no profit component.[5] (*Id.* ¶ 74). For purposes of summary judgment, the Court cannot infer from these two invoices that United *never* made a profit on GNF projects, and the Trust Funds have pointed to no deposition testimony where the key witnesses were asked to explain whether United made any profit and if so, how. The parties will have an opportunity at trial to provide additional evidence concerning United's profits on the GNF projects. This will be a significant issue, for if United indeed made no profit from work performed for GNF, this will be a strong indicator that United and GNF operate as a single employer.

In sum, looking at the totality of the circumstances, questions of fact remain as to whether the interrelation of operations between United and GNF supports a finding that they are a single employer. This factor thus does not weigh in favor of either party on summary judgment.

## C.    Common Management and Centralized Control of Labor Relations

The remaining two factors, "common management" and "centralized control over labor relations," are closely related. Common management looks at "actual or active

---

[5]       In their reply brief, Defendants object that Plaintiffs "provide no supporting evidence to show that the amounts invoiced to Great Northern did not include any profit." (Doc. 38, at 13). This argument is unavailing because Defendants do not dispute the relevant paragraphs of Plaintiffs' 56.1 Statement, or provide any contrary evidence. (Doc. 33 ¶¶ 72 and 74). *See Saffold v. Village of Schaumburg*, No. 08 C 5032, 2010 WL 1752576, at *2 (N.D. Ill. Apr. 30, 2010) ("Pursuant to Local Rule 56.1, facts included in a party's Local Rule 56.1 statement that are not properly denied by the opposing party are deemed to be admitted.").

control, as distinguished from potential control, over the other's day-to-day operations . . . .," *Cremation Society of Illinois*, 869 F.3d at 617 (quoting *Lippert Tile*, 724 F.3d at 947), with an emphasis on "common control over hiring and firing of employees, as well as other daily management decisions." *Automobile Mechanics' Local No. 701 Union and Industry Pension Fund v. Dynamic Garage, Inc.*, No. 16 C 8967, 2018 WL 4699842, at *6 (N.D. Ill. Sept. 30, 2018) (citing *N.L.R.B. v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1288-89 (7th Cir. 1989)). Similarly, centralized control of labor relations considers "who is responsible for hiring, firing and evaluating employees." *Cremation Society of Illinois*, 869 F.3d at 617. *See also American Weathermakers, Inc.*, 150 F. Supp. 3d at 907 ("The centralized control of labor relations means whether the companies share responsibility for making day-to-day labor relations decisions, such as setting wages, hiring and firing.").

The Trust Funds argue that United and GNF are each managed by the same two people, Nick and Nino, who also both control labor relations for each company. Defendants assert that Nick manages employees exclusively for United and Nino manages employees exclusively for GNF. The evidence concerning these factors is inconclusive, as neither party has provided sufficient and clear proof in support of their respective positions regarding how United and GNF were managed and operated from 2010 onward, including during the later and most relevant years.

Prior to 2010, Nino and Nick both hired employees for United. (Doc. 36, at 17 ¶ 1). Nino bore primary responsibility for the day-to-day operations of United, including controlling payroll, paying bills, managing the accounts, and performing administrative duties, though Nick assisted with these tasks. (*Id.* ¶ 3). Both men also performed flooring installation work as union carpenters and hired workers for the company. (*Id.* ¶¶ 3, 5).

18

Beginning in or about 2010, Nino resigned from the union and became responsible for recruiting, interviewing, hiring and scheduling employees to perform floor installation work for GNF while Nick remained with United. (Doc. 33 ¶ 30; Doc. 33-1, at 454, 456-57, K. Desario Dep., at 190-91, 199-203). Defendants deny that Nino was "managing" GNF at that time, but it is unclear who else could have been doing so. Though Nino's wife Anita Turi is a 50% owner of GNF, she testified that she has never really been involved with the company. (Doc. 33-1, at 371, A. Turi Dep., at 16) ("I don't really do much" related to GNF). When GNF was formed in 2009, Anita had twins and so asked Susan Stricklin to step in and perform her duties.[6] (*Id.* at 371-72, A. Turi Dep., at 16-17, 19). To that end, Stricklin was identified on corporate documents as being president of GNF at the time of formation. (Doc. 33 ¶ 25).

Notwithstanding that title, Stricklin denied having any managerial responsibilities at the company, testifying that she was just a salesperson selling carpet to GNF's residential customers and was not involved in the commercial side of the business. (*Id.* ¶ 27; Doc. 36 ¶ 25; Doc. 33-2, at 35, 50-51, Stricklin Dep., at 70, 133-34) ("I was strictly sales."). In fact, it is undisputed that Stricklin had "(a) no involvement in hiring or firing employees, (b) no involvement in deciding whether the company should maintain a warehouse, (c) no involvement in selecting the company's payroll service, (d) no involvement in handling the company's payroll, (e) no involvement in the company's insurance matters, (f) no involvement in reviewing the company's financial statements, (g) no involvement in reviewing the company's tax returns, and (h) no involvement in any operational decisions of Great Northern Flooring, such as where it would lease space,

---

[6] Katerina Desario testified that she and Anita both hired Stricklin. (Doc. 33-1, at 410, K. Desario Dep., at 17).

[or] who it would hire for professional services like accountants and lawyers." (Doc. 33 ¶¶ 24, 25). Until at least 2012, moreover, Stricklin continued to operate her own business – Timeless Treasures – which did faux finishing, upholstering, furniture rehabilitation, window treatments, and basic design. (*Id.* ¶ 28).

Nino testified that Stricklin worked with homeowners, "helped bring in carpet samples, displays," "talked to reps in the industry" about placing their products in the showroom, "opened and closed the place every day," and worked at the office fulltime. (Doc. 33-1, at 581, G. Turi Dep., at 66-67). But Stricklin testified she was rarely in the office at all. (Doc. 33-2, at 43, Stricklin Dep., at 105). She also had no understanding of the GNF "corporate consent documents" she signed and simply did so at the direction of Anita and Katerina. (Doc. 33 ¶¶ 17, 26; Doc. 33-2, at 48, Stricklin Dep., at 123-24) ("Q. It was pretty much, here, we need you to sign this, and you would sign it? A. Correct.").

The other 50% owner of GNF, Katerina Desario, testified that from 2010 through 2014, she only worked for GNF part-time, helping answer phones as a receptionist. (Doc. 33 ¶ 22; Doc. 33-1, at 413, 416, K. Desario Dep., at 28, 40). In 2014, Stricklin left GNF (either Nino and Katerina jointly told Stricklin she was being fired/laid off or she quit to pursue other opportunities) and Anita Turi took over the title of president and tried to "step[] back in" at GNF two days a week. (Doc. 33 ¶ 29; Doc. 33-2, at 26-27, Stricklin Dep., at 37-38; Doc. 33-1, at 372, 375, A. Turi Dep., at 19, 31-32; Doc. 33-1, at 420, K. Desario Dep., at 57; Doc. 33-1, at 587, G. Turi Dep., at 92). At some point in 2015, however, she once again stopped participating in the business.[7] (Doc. 33-1, at 386, A.

---

[7] GNF's website continues to identify Anita as president of the company. (Doc. 33-1, at 371, A. Turi Dep., at 15; Doc. 33-6, at 108).

Turi Dep., at 77) ("Q. But since 2015 you're not doing anything for Great Northern Flooring anymore, correct? A. No. Yes. No. I don't do anything.").

Since approximately 2015, Katerina has been responsible for payroll, accounts payable, accounts receivable, and office management at GNF. (Doc. 33-1, at 416, K. Desario Dep., at 38, 39; Doc. 36 ¶ 28). The Trust Funds find it significant that Katerina had no experience in the flooring installation industry prior to June 2010. (Doc. 33 ¶ 21). That fact does not conclusively demonstrate she was only a figurehead at GNF as of 2015 and during the relevant 2016 through 2017 time period. That said, Katerina did not do any hiring, and when asked at her deposition what specific employees did for GNF, she had no idea and said Nino would know. (*Id.* ¶ 32; Doc. 33-1, at 456-57, K. Desario Dep., at 199-203). And it is unclear whether she determined employee salaries. While Nino and Anita both testified that Anita and Katerina set the salaries, Katerina testified that Nino is the one who set workers' salaries and was also involved in setting a salary for Susan Stricklin when she served as president of GNF.[8] (Doc. 34-1 ¶ 27; Doc. 36 ¶ 27; Doc. 33-1, at 606; G. Turi Dep., at 168; Doc. 33-1, at 440, 462, K. Desario Dep., at 136, 224-25; Doc. 33-1, at 393, A. Turi Dep., at 104, Katerina "would talk to me about what Nino would get paid and then I would kind of tell her what I would like him to get paid.").

Nino testified that he only set wage rates for the workers he manages for the installation department (this appears to include installers, truck drivers, warehouse workers, and service technicians). (Doc. 34-1 ¶ 32; Doc. 33-1, at 591-94, 610, G. Turi Dep., at 109, 111, 116, 119, 184). But the record does not indicate what other employees

---

[8]    Defendants claim Anita Turi "has been consulted regarding salaries and also regarding hiring personnel for Great Northern." (Doc. 35-1 ¶ 3). The cited evidence is Nino's deposition testimony stating only that that he "asked my wife how much I can get paid." (Doc. 33-1, at 606, G. Turi Dep., at 168).

might be hired at GNF. And the Trust Funds claim Nino manages the same employees at GNF that he used to manage when he was an owner of United. (Doc. 32, at 12). As noted earlier, Nino hired 13 current and former United employees to work on GNF jobs. A number of those employees were working for both United and GNF in the same weeks and months. *See Finkel v. Frattarelli Bros., Inc.*, No. 05-CV-1551, 2008 WL 2483291, at *11 (E.D.N.Y. June 17, 2008) (relevant factor in assessing centralized control over labor relations is "whether the entities shift employees back and forth.").

As for Nick and United, Nick resigned from the union in 2011 or 2012. (Doc. 33-1, at 498, N. Desario Dep., at 34). At some point thereafter (neither party provides an exact date), he started working for GNF as a "Commercial Estimator" in addition to serving as president of United. (Doc. 33 ¶ 45; Doc. 33-1, at 422, K. Desario Dep., at 65, "Q. And how long has [Nick] been an estimator for Great Northern Flooring? A. Roughly . . . on and off since 2014."). In that role, Nick prepared: a quote for the Meadows Credit Union project on April 8, 2016; a revised quote for Meadows on April 14, 2016; a quote for the Streator Onized Credit Union project on April 21, 2016; a quote for the Illiana project on October 27, 2016; a revised quote for Illiana on January 23, 2017; a quote for the Andigo project on April 18, 2017; a quote for the Andigo project on April 19, 2017; a quote for the Illiana project on May 23, 2017; a quote for the Bank of Pontiac project on August 10, 2017; a quote for the Earthmover CU project on November 10, 2017; and a quote for the Earthmover Administration Building on November 10, 2017. (Doc. 33 ¶ 46). For the Meadows Project, Nick also determined what United would charge GNF for the union labor and then handed the invoice to his wife Katerina so GNF would pay it. (*Id.* ¶ 71; Doc. 33-1, at 525, N. Desario Dep., at 144-45).

Nick also ran projects for GNF. He was responsible for making sure that: punch list items were completed; materials were ordered and received; a humidity test was performed on a jobsite; GNF received change orders and purchase orders; projects were properly scheduled; and GNF certificates of insurance were provided. Nick provided flooring samples, provided customers with project updates, and provided GNF's business license to customers when requested. (Doc. 33 ¶ 47). Nick testified that he only manages union laborers such as Mark Jones and James Nelson when they work for United performing subcontracts for GNF. There is evidence, however, that Nick estimated jobs for GNF where those same union laborers worked under his direction and were paid by GNF rather than United. (Doc. 36, at 21 ¶ 7; Doc. 33-1, at 553, N. Desario Dep., at 255-56). And though Nick testified he is responsible for handling payroll for United, the payroll documents are all addressed to Katerina at the GNF office.

The Trust Funds say common management is evident from a January 16, 2017 email that GNF employee Charlene Gonzalez sent to LaMacchia Group stating "I work **for** Nick Desario." (Doc. 33 ¶ 48; Doc. 33-4, at 26) (emphasis added). In a March 27, 2017 email concerning the Illiana project, however, Gonzalez said "I work **with** Nick Desario." (Doc. 33-4, at 28) (emphasis added). These emails are ambiguous and fail to clarify whether Nick was Gonzalez's colleague, manager, or boss.

In support of their assertion that Nick manages employees exclusively for United and Nino manages employees exclusively for GNF, Defendants rely on deposition testimony from Peter Caucci. (Doc. 34-1 ¶¶ 12, 23, citing Doc. 33-3, at 427, 428, Caucci Dep., at 12, 17; Doc. 34, at 9). But Caucci testified only as to who he believes manages him at each company (Nick at United and Nino at GNF), and he did not speak to other

workers.  This testimony is not dispositive given Nick's role in managing projects for GNF.  At best, this testimony raises a question of fact on this issue.

Defendants also argue there is no common management or centralized control of labor relations because there are no facts showing that members of one company were responsible for "whether either company bids on a job or not."  (Doc. 34, at 7) (citing *Lippert*, 724 F.3d at 947) ("More importantly, the Lippert Group personnel make the critical decision whether Lippert Tile or Dean Alan should make a bid on a particular project, and if so, what to bid, as if all three companies were part of the same organizational chart.").  This argument might carry more weight absent evidence that Nick (United's president) was regularly involved in preparing quotes for GNF jobs and simultaneously served as the supplier of union labor where required for GNF projects.  (Doc. 33 ¶ 46).

On the record presented, neither the common management nor the centralized control of labor factor weighs clearly in favor of or against a finding of single employer status.  The testimony concerning who managed GNF and controlled its labor operations is at best inconsistent, causing confusion regarding the roles specific individuals played at the company over the years.  There is also ambiguity as to the nature of Nick Desario's relationship with GNF and his responsibilities at that company versus his obligations at United.  The Court will need to hear and weigh testimony on these matters at trial.

**D.    Summary**

Looking at the totality of the circumstances, a fact finder must decide whether United and GNF are so interrelated that they lack an arm's-length relationship with each other and constitute a single employer.  Though there is a fairly high degree of interrelation of operations, questions remain as to who owns and is responsible for

managing the companies, and whether Nick and Nino jointly oversee labor relations. There is also a need to make credibility findings and weigh the evidence in resolving these issues, and this cannot be done at the summary judgment stage. The parties' cross-motions for summary judgment on this issue are both denied.

## III.   Alter Ego

The Trust Funds argue an alternative, equitable basis for binding GNF to the terms of the collective bargaining agreement: its alleged status as an alter ego of United. *Chicago Dist. Council of Carpenters Pension Fund v. Ceiling Wall Sys., Inc.*, No. 94 C 4423, 1998 WL 773993, at *4 (N.D. Ill. Oct. 30, 1998); *Chicago Dist. Council of Carpenters Pension Fund v. Sunshine Carpet Servs., Inc.*, 866 F. Supp. 1113, 1115 (N.D. Ill. 1994) ("[T]he purpose underlying the alter ego doctrine in the ERISA context is to prevent a corporate business from limiting its pension fund responsibilities by fractionalizing its business operations."). "To establish that one company is an alter ego of another, a plaintiff must demonstrate 'the existence of a disguised continuance of a former business entity or [an] attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.'" *TMG Corp.*, 206 F. Supp. 3d at 1361 (quoting *Trustees of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 789 (7th Cir. 1993)).

"When attempting to discern whether a new company is another's alter ego, courts (or, at trial, finders of fact) engage in a fact intensive analysis, examining factors like whether the two companies have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Id.* Unlike the single employer doctrine, however, "unlawful motive or intent is the most critical factor for finding

25

alter ego status in the Seventh Circuit." *Id.* "[I]t is the intent of the signatory to the collective bargaining agreement—here [United]—to avoid its obligations under the agreement that matters." *Sulzberger Excavating Co.*, 2017 WL 4074018, at *7.

Viewing the record as a whole, the Court finds that questions of fact preclude summary judgment for either party on the Trust Funds' alter ego claim. For reasons stated with respect to the single employer doctrine, there is a question of fact as to whether United and GNF share common ownership, management, operation, business purpose, and supervision sufficient to find that they are alter egos of one another. In addition, this Court must hear testimony and make credibility findings to decide Defendants' motives in creating GNF. The Trust Funds allege that Nick and Nino set up GNF as a sham entity so they could perform flooring installation work without having to honor United's obligations under the collective bargaining agreement. Defendants deny this.

The record is muddled as to who was responsible for starting GNF and the motivations for doing so. Anita and Katerina both testified that it was their idea to form the company and have it geared towards retail residential work. Yet neither of them had any flooring experience at the time, nor did they actually perform any real work for the company for many years after it was incorporated. (Doc. 33-1, at 424, K. Desario Dep., at 71-72; Doc. 33-1, at 371, A. Turi Dep., at 16-17; Doc. 33-1, at 576, G. Turi Dep., at 47). In their reply brief, Defendants claim that Nino Turi "started a non-union company, Accurate Flooring, to install carpets at non-union jobs for two years." (Doc. 38, at 4). According to Defendants, after Anita and Katerina formed GNF they would "contact Nino at Accurate Flooring to obtain the names of carpenters and installers who could do the

installation." (*Id.* at 4). Defendants provide no record support for these assertions, or explain uncontroverted evidence showing that Accurate Flooring was the d/b/a of GNF as opposed to a separate company. (Doc. 33-1, at 598, G. Turi Dep., at 134, "A. When *we* were doing work for – just installations, *we* used Accurate Flooring. And when *we* sold product, *we* used Great Northern Flooring.") (emphasis added).

Rather than clearly address these facts, Defendants argue that summary judgment in their favor is warranted based on a single case: *Chicago Regional Council of Carpenters Pension Fund v. Vacala Masonry, Inc.*, 946 F. Supp. 612 (N.D. Ill. 1996). In that case, brothers Chuck and Pat Vacala incorporated VCI in 1980 to operate as a general contractor. VCI was never a signatory to a collective bargaining agreement. *Id.* at 614. In 1990, Chuck broke off to form VMI, a non-union masonry subcontractor, with Pat and Chuck as majority owners. *Id.* at 614-15. A few years later, in October 1993, VMI became a signatory to a collective bargaining agreement to accommodate a VCI worker who was concerned about losing union benefits he had obtained from previous employment. VMI hired the worker, along with additional union carpenters, and leased them back to VCI on an as-needed basis. *Id.* at 615.

Plaintiffs argued that VCI was VMI's alter ego because its relationship with VMI enabled it to employ union carpenters without having to sign the collective bargaining agreement. *Id.* at 617. The court disagreed, finding that VMI did not have any unlawful motive or intent to avoid the terms of its collective bargaining agreement. *Id.* at 617-20. The court explained that the alter ego doctrine is "designed to prevent a signatory company from using a non-signatory company to dodge the signatory's obligations under a collective bargaining agreement." *Id.* at 618. The plaintiffs "stood this analysis on its

head by arguing that a non-signatory company (VCI) has used a signatory company (VMI) to avoid the obligations of a collective bargaining agreement by avoiding the need to sign a collective bargaining agreement altogether." *Id*. As the court explained:

> The alter ego doctrine was not intended to be used as a means of coercing a non-union company into becoming a union company by requiring it to sign a collective bargaining agreement or by requiring it to comply with the terms of a collective bargaining agreement which it never signed, *absent proof that the non-signatory company was being used by the signatory to avoid its collective bargaining agreement obligations*.

*Id*. at 18 (emphasis added). Since there were "no allegations that VMI attempted to mislead auditors as to its relationship with VCI or attempted to divert work to VCI to avoid its obligations under the collective bargaining agreement," the alter ego doctrine did not apply. *Id*. at 20.

Unlike in *Vacala Masonry*, United was operating as a union business for at least 13 years before GNF was formed as a non-union entity. There is also evidence here that could support a finding that Defendants established GNF for the purpose of avoiding United's existing obligations under the collective bargaining agreement, and sought to mislead auditors about the connection between the companies. The Trust Funds note, for example, that GNF initially refused to produce records to Legacy for purposes of the 2018 audit (though it later did so). (Doc. 37, at 6; Doc. 33 ¶ 8). In addition, records show that during a 2013 Legacy audit, Susan Stricklin (a/k/a Susan Fry) served as United's representative and used a United email address ("Susan Fry, United Carpet Inc. <susanfry@sbcglobal.net") without revealing she was the president of GNF. (Doc. 37, at 6; Doc. 33 ¶¶ 51, 52). The auditor who conducted the 2013 audit, Alan Droba, submitted a declaration stating that though he asked Susan Fry for records concerning Accurate Flooring Services, the d/b/a of GNF and a potentially related entity, she "never disclosed

28

to me that she worked for Accurate Flooring Services, nor did Susan Fry ever disclose to me the existence of Great Northern Flooring, Inc." (Doc. 33-4, at 39, A. Droba Decl. ¶¶ 7, 8, 11; Doc. 33 ¶¶ 53, 54). Instead, Susan emailed Droba stating that "[w]e have contacted Accurate Flooring Services and told them of your request," making it sound "as though she had no affiliation with [Great Northern d/b/a Accurate Flooring]." (Doc. 37, at 7; Doc. 33 ¶ 54). Defendants respond that Susan did not have access to records from GNF so "[t]he only thing allowable or reasonable . . . was to put the auditor in contact with the company's owner which [Susan] did in fact do." (Doc. 38, at 10). This explanation rings hollow given Susan's position as president of GNF d/b/a Accurate Flooring at the time.

The court finds that all of these factual questions, particularly those surrounding Defendants' motive and intent in forming GNF, preclude an award of summary judgment to either party. Their cross-motions on this issue are both denied.

## CONCLUSION

For the reasons stated, Plaintiffs' Motion for Summary Judgment [32] and Defendants' Cross Motion for Summary Judgment [34] are both denied.

ENTER:

Dated: June 10, 2020

_____
SHEILA FINNEGAN
United States Magistrate Judge