**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 18 C 4785** |
| **UNITED CARPET, INC., an Illinois corporation, and GREAT NORTHERN FLOORING, INC., an Illinois corporation,** | ) ) ) ) ) | **Magistrate Judge Finnegan** |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The plaintiffs, which are pension and health and welfare funds (the "Trust Funds") related to the Chicago Regional Council of Carpenters (the "Union"), filed suit against Defendants United Carpet, Inc. ("United") and Great Northern Flooring, Inc. ("GNF") seeking to recover fringe benefit contributions under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for the period January 1, 2016 through December 31, 2017. United was formed by Gaetano ("Nino") Turi and Nicola ("Nick") Desario to perform commercial and residential flooring installation work, and has long been a signatory to a collective bargaining agreement with the Union. The Trust Funds allege that Nino Turi, Nick Desario, and their spouses formed GNF as a sham non-union flooring company so they could employ United's current and former union workers to perform bargaining unit work on non-union jobs without paying them union wages and fringe benefits. The Trust Funds also allege that for flooring projects requiring union labor, GNF used United as a pass-through company, allowing GNF to obtain union work without having to sign an agreement with the Union. For these and other reasons, the Trust

Funds contend that United and GNF constitute a single employer and/or are alter egos of one another and so are jointly liable for paying $939,094.71 in unpaid fringe benefit contributions to the Union for bargaining unit work performed during the audit period, along with interest, liquidated damages, auditors' fees, and attorneys' fees and costs. Defendants deny the allegations.

Based on the parties' consent under 28 U.S.C. § 636(c), the case was reassigned to this Court for all purposes, including the entry of final judgment. (Doc. 9, at 4; Doc. 10). Thereafter, this Court denied the parties' cross-motions for summary judgment, *Chicago Regional Council of Carpenters Pension Fund v. United Carpet, Inc.*, No. 18 C 4785, 2020 WL 3077541 (N.D. Ill. June 10, 2020), and conducted a bench trial. This Memorandum Opinion and Order now sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.[1] In adjudicating the claims, the Court considered the totality of the evidence and the weight to accord specific evidence. In assessing the credibility of witnesses, the Court considered, among other things, each witness's demeanor, intelligence, ability and opportunity to see, hear, or know the matters about which the witness testified, memory, potential for bias, and, significantly, the believability of the testimony in light of other evidence. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575-76 (1985); *Furry v. United States*, 712 F.3d 988, 993 (7th Cir. 2013).

---

[1] To the extent any finding of fact constitutes a conclusion of law, the Court adopts it as such, and to the extent any conclusion of law constitutes in whole or in part a finding of fact, the Court adopts it as such. *See Miller v. Fenton,* 474 U.S. 104, 113-14 (1985). The various subheadings that appear throughout this opinion are not themselves findings or conclusions, but are merely inserted for the convenience of the reader.

Based on the evidence presented and the applicable law, the Court finds that the Trust Funds proved by a preponderance of the evidence that United and GNF are a single employer and alter egos of one another, so awards judgment to the Trust Funds in the amount of $1,315,986.32, plus attorneys' fees and costs in an amount to be determined.

## DISCUSSION

### I. The Parties

#### A. The Plaintiff Trust Funds

The Trust Funds are multi-employer funded trust funds that provide pension, welfare, training and promotional benefits to Union members and their families. (Stip. 1).[2] Each individual Trust Fund is organized, administered and governed according to the terms of a corresponding trust agreement (collectively, the "Trust Agreements"). (Stip. 2; Exs. 1-7). The Trust Funds are also administered according to the terms of the Area Agreement negotiated between the Union and participating employers' representatives. (Stip. 3). The Area Agreement relevant to this case was in effect from June 1, 2014 through May 31, 2019. (Ex. 8). Under the terms of the Trust Agreements and the Area Agreement, an employer bound by the Area Agreement was "obligated to pay fringe benefit contributions to the Trust Fund for each hour worked by employees performing bargaining unit work." (Stip. 4).

#### B. The Defendant Flooring Companies and their Owners

##### 1. United

United is a flooring installation company that was formed by Nino Turi and Nick Desario on April 6, 1995. (Stip. 7, 8). On June 17, 1996, United signed an agreement

---

[2]     Stipulations are found in the parties' Joint Pretrial Order Submission. (Doc. 89, at 5-22).

with the Union that was subsequently amended in 1998 and renewed on October 14, 2011. As of the trial, United had never terminated the agreement. (Stip. 15-18; Exs. 42-44). From 1995 to 2010, Nino and Nick were 50% owners of the company and shared responsibility for overseeing daily management and operations. (Stip. 9; Doc. 33-1, at 500-01, Nick Dep., at 44-46; Doc. 33-1, at 571-72, Nino Dep., at 29-31). They were also union members who performed flooring installation work as union carpenters. (Stip. 19, 21). For many years, United served as a provider of union flooring installation workers primarily on large commercial projects and newly constructed residential housing. (Tr. at 236).[3] A considerable amount of United's work was for builder Koeckritz International, Inc. ("Koeckritz"). (Tr. at 223, 326).

In 2008, there was a significant crash in the housing and financial markets that caused a national downturn in wealth and greatly impacted United's business. (Stip. 53). Due to the crash, the number of homes built by Koeckritz began to decline, with a dramatic slowdown in 2010 along with a shift away from using union labor wherever possible to keep costs down and remain competitive. (Tr. at 326, 487-88, 697, 727). About that time, Koeckritz's vice president of sales for the builder division, Jeffrey Johnson, had a meeting with Nick and Nino, and they came to an arrangement that Johnson described at trial: "if there was a way to create a nonunion entity with one of the partners, Nino, and to create what would be our new labor rates, [then] I could . . . submit our proposals to maintain these large builders." (Tr. at 489-90). As discussed in more detail later, the result was that, in 2010, Nino left United and started Accurate Flooring, which took over supplying Koeckritz with flooring installation workers in place of United, but at non-union rates. (Tr.

---

[3]     Trial transcripts are found at Doc. 101 (pages 1-171), Doc. 102 (pages 172-391), Doc. 103 (pages 392-621), Doc. 104 (pages 622-755), and Doc. 105 (pages 756-92).

at 327 (Nick Test.), 592, 597).  Conveniently, some of the installers Nino hired to work at Accurate Flooring had also worked on union jobs for United, which continued to get some union work from Koeckritz.  (Tr. at 491, 593).

      2.    **GNF**

GNF was formed in 2009 ostensibly only to provide both flooring material sales and installation services for smaller, non-union residential and commercial projects.  (Stip. 11, 12).  Katerina Desario and Anita Turi (the spouses of Nick Desario and Nino Turi) claim that they were entirely responsible for both the idea and the decision to start GNF and it had nothing to do with Nick, Nino, or United.  Katerina and Anita had no personal experience working in the flooring industry, nor had they ever started a business, though GNF's website stated that it was "a family-owned business in Northern Illinois with over 20 years' experience in the industry."  (Ex. 30; Tr. at 428-29, 438, 528, 548-49).  Katerina and Anita also had little time to devote to a new business since both were busy caring for their small children.  (Tr. at 429, 556).  As a result, though Katerina and Anita became 50% owners of GNF upon incorporation on June 15, 2009, they hired Susan Stricklin (a/k/a Susan Fry or Susan Martin) as president and tasked her with setting up and running the company.  (Ex. 121; Tr. at 186-87, 192-93, and 559-60 (Anita Test.) (Susan "did everything.  She was the most involved.  She was the one that was freer.  And like I said earlier, she was the hustler.  She was the one that really went and got the work.  Q. But for the existence of Sue Stricklin, could you have done this company [GNF]? A. No.")).  Notably, Susan had previously worked for Nick and Nino at United from April 2002 until she was laid off in 2008 following the housing market crash.  (Stip. 23, 24).

Susan remained with GNF until September 2014 during which time Anita did not do any work for the company, and Katerina worked part-time a few days a week. (Tr. at 232) (Stricklin Test.). More specifically, Katerina answered phones in the morning two days a week. (Doc. 33-1, at 413, 416, K. Desario Dep., at 28, 40-41). Susan was eventually let go by GNF due to the company's financial problems and lack of sufficient retail business. (Tr. at 229-30 ("Q: Would you describe for us the circumstances of your termination or ending at Great Northern. A. The market was so slow. Retailwise I just wasn't getting enough business. We were struggling as a company financially, and I knew – I saw the writing on the wall. I was the one liability. The last liability that they had to get – you know, that they could possibly save money and get rid of me.")). After Susan left, Katerina took over her office duties, including payroll, accounts payable, accounts receivable, and office management. Katerina was not involved in hiring and had no idea what specific employees did for GNF. (Tr. at 229-30; Doc. 33-1, at 416, 456-57, K. Desario Dep., at 38, 39, 199-203; Doc. 33-1, at 586, N. Turi Dep., at 87). As for Anita, she tried to "step[] back in" at GNF two days a week in 2014, but once again stopped participating in the business as of 2015, and did not return until August 2017 when she worked a small number of hours each week (earning $150 per week). (Pls' Demonstrative Exhibit ("PDEx") 5, Doc. 89, at 74; Doc. 33-1, at 386, A. Turi Dep., at 77).

### 3. Nino resigns from Union, transfers United ownership to Anita, and starts Accurate Flooring Services

After GNF was incorporated, it took about a year, until mid-2010, to get the GNF showroom up and running and secure clients. (Tr. at 204, 591). Around the same time that GNF opened its showroom and began to secure clients, Nino stopped working at United, and he resigned from the Union on July 5, 2010. (Ex. 8; Tr. at 591-92). The next

day, on July 6, 2010, Nino sold his shares in United to his wife Anita, making her a 50% owner of both United (with Nick) and GNF (with Nick's wife Katerina). Also on July 6, 2010, Nino incorporated a new and non-union flooring installation company called Accurate Flooring Services, Inc. ("Accurate Flooring") of which he was its sole owner and president. (Stip. 48, 51, 52). Over the next few years, Accurate Flooring's clients included GNF as well as other companies; however, GNF's only flooring installer was Accurate Flooring. (Tr. at 201, 229, 568, 592). (*See also* Tr. at 203 (Stricklin Test.) ("[E]very time I got a job, I would call Nino, and he had the installers, and they would come and install.")).

### 4. 2013 audit of United and dissolution of Accurate Flooring to become part of GNF

In early 2013, the Trust Funds retained Legacy Professionals, LLP ("Legacy") to conduct an audit of United's fringe benefit contributions for the period July 1, 2011 through December 31, 2012. United's designated contact person for the audit was Susan, though she was working for GNF at the time. (Exs. 14, 20). Susan never informed Alan Droba, Legacy's Supervising Senior Auditor, that she was not the proper contact person for United. (Tr. at 176, 178, 183 (Droba Test.) ("We reached out to the phone number for United Carpet, and [Susan] presented herself as the contact who can help us in providing records.")). During the course of the audit, Legacy identified Accurate Flooring as a possible related non-signatory company and asked for information about that entity. (Ex. 20, at 2).

On March 5, 2013, Susan sent an email to Droba identifying herself as "Susan Fry, United Carpet Inc." and stating that she had contacted Accurate Flooring and the owner (identified as Gaetano Turi) was "not willing to have an audit done" since it was not a union company. (Ex. 15; Tr. at 599). The Trust Funds then filed a lawsuit to obtain the

records from Accurate Flooring but dropped it after being informed by United's counsel that Accurate Flooring was no longer in business and United was going out of business as well. (Tr. at 65, 88). A few months later, however, the decision was made that Accurate Flooring should become a part of GNF. (Tr. at 575, 600-01, 707). To accomplish this, Nino dissolved Accurate Flooring in August 2013, and that same month GNF adopted "Accurate Flooring Services" as an assumed name. (Stip. 49; Ex. 134). When Nino joined GNF, so did the installers who had worked for Accurate Flooring and performed the installation work for GNF. Some of those installers had also worked for United. (Tr. at 593 (Nino Test.) ("Q: And so Great Northern Flooring was using the installers that you had hired for Accurate Flooring to do their work, correct? A. After I joined Great Northern Flooring, the employees came with me, yes. Q. Okay. And some of those employees are some of the same employees who had worked for United Carpet, correct? A. Yes.")).[4]

### 5. Nick joins GNF

Also in 2013, Nick started doing commercial estimating work for GNF while still operating United. (Stip. 65; Ex. 30). Though Nick said he was not an employee of GNF at that point, he was identified on the GNF website as a member of "Our Staff" as "Estimator, Commercial Estimating Department" and had a GNF email account, nick@gnflooring.com. (Ex. 30; Tr. at 238-39, 252-54). Rather than seeking only non-union projects, GNF bid on multiple commercial projects requiring union labor and for

---

[4] The parties stipulated that after Nino started working for GNF, he used the following 13 employees who were current or former employees of United to perform flooring installation work for GNF: Francisco Acosta, Martin Bahena, Peter Caucci, Jose Antonio Cruz, Juan Carlos Cruz, Pietro "Peter" Desario, Mark Jones, Dan Lerma, Daniel Monico, Alejandro Navarro, James Nelson, Mario Salazar, and Nick Torina. (Doc. 63, at 21; Stip. 78). These are the same 13 employees for whom the Trust Funds seek fringe benefit contributions during the audit period.

which Nick prepared the bids. (Tr. at 254-72). For example, in April 2016, GNF submitted a bid to LaMacchia Group to do the flooring on a Meadows Credit Union project. Using his GNF email address (nick@gnflooring.com), Nick sent LaMacchia's project manager Brandon Bosch a proposal on behalf of GNF to supply and install flooring. (Ex. 213, at 1-2). Nick testified that he used that email because "I was representing [GNF]." (Tr. at 81). The revised quote identified him as "Nick Desario, Great Northern Flooring," and reflected GNF's business address. (Tr. at 256).[5]

Since LaMacchia preferred union labor, GNF needed to supply union member installers to perform the work. This was accomplished by GNF subcontracting with United to provide and pay union installers. These installers were also employees of (and paid by) GNF when they performed work on non-union projects. *See infra*, pp. 36-37. Under this arrangement, Nick was simultaneously bidding on work for GNF as its Commercial Estimator and supplying union labor to GNF for these projects as president of United. No written quotes or contracts were exchanged between GNF and United, as Nick testified that his practice with all customers was to transact business by phone and merely provide an invoice after the work was completed. (Tr. at 341, 349). For labor performed on the Meadows Credit Union project, Nick prepared a United invoice and simply handed it to his wife Katerina, who paid it on behalf of GNF. (Tr. at 287; Ex. 213, at 1-2).

The same arrangement is evident for other proposals Nick made to LaMacchia on behalf of GNF during 2016 and 2017. (Ex. 213, at 5-25; Tr. at 287). It continued after

---

[5]     The parties stipulated that Nick bid work for GNF, including preparing quotes for the following projects: Meadows Credit Union (4/8/2016 and 4/14/2016); Streator Onized Credit Union (4/21/2016); Illiana (10/27/2016 and 1/23/2017); Andigo (4/18/2017, 4/19/2017 and 5/23/2017); Bank of Pontiac (8/10/2017); Earthmover Credit Union (11/10/2017); and Earthmover Administration Building (11/10/2017). (Doc. 63, at 20; Stip. 66).

Nick was placed on GNF's payroll in October 2016. By that time, Nick was also working from a GNF office. (Tr. at 607) (Nino Test). As discussed later, in preparing the GNF bids for union projects, Nick agreed on behalf of United to give GNF preferential pricing terms even though this meant United made little profit. This arrangement ultimately ended when United was involuntarily dissolved in 2018 after the Trust Funds began a new audit that led to this lawsuit. (Ex. 262; Tr. at 341, 405).

### 6.    Coordinated distribution of funds from United and GNF

Weekly payments from United (to Nick) and from GNF (to Nick, Katerina, Nino, and Anita) in the form of wages resulted in the Desario family receiving approximately 60% of the collective total payments made by the two companies, and the Turi family receiving approximately 40%. (PDEx 4 and 9, Doc. 89, at 71, 82).[6] The amount of any payment Nick received from United was directly correlated with and determined the amount of Katerina's paycheck from GNF. Nick initially denied that he and Katerina coordinated payments from United and GNF, but ultimately conceded they must have discussed it since the payrolls were run on the same day. (Tr. at 297-98). And Katerina acknowledged that the only consideration behind the Desario's earnings each week was the family budget: "[I]f [Nick] was able to take a salary – a sufficient salary – whatever we needed to fulfill our budget, then he would take it from his company [United], and then I would just make up the difference [through GNF]." (Tr. at 467-68, 471, 473, 506).

This coordination is particularly obvious in the period from December 30, 2014 through August 12, 2015. In any week in which Nick took a payment from United ($1,585), Katerina did not take a paycheck from GNF. But in any week when Nick did not take a

---

[6]    The parties stipulated that the payments from United and GNF to Nick, Katerina, Nino and Anita as reflected in Plaintiffs' demonstrative exhibits 1-9 are accurate.

payment, Katerina received a $1,585 paycheck from GNF. (PDEx 11, Doc. 100, at 2).[7]
After Nick received his last United payment in year 2015 (on August 12, 2015), Katerina
began receiving a GNF paycheck every week. (*Id.*). This coordination continued into
year 2016 where, during the weeks of January 8 and 15, 2016, Nick received no payments
from United, and Katerina received $1,835 from GNF each week, for a total of $1,835 to
the Desario family. But from January 22, 2016 to October 7, 2016, Nick generally
received weekly payments from United in the amount of $1,335. During that same period,
Katerina's weekly wages from GNF then dropped by $1,335 to only $500, even though
there was no change in her job duties and responsibilities. (Tr. at 298-99, 471-72). The
total for the Desario family remained $1,835 per week.

In mid October 2016, Nick stopped receiving any checks from United, and then
began receiving a regular weekly paycheck from GNF. Specifically, from October 14,
2016 to August 4, 2017, Nick was generally paid weekly wages from GNF in the amount
of $1,735. During the same period, Katerina's wages from GNF fell from $500 to $300,
so the Desario family then was generally receiving a total of $2,035 each week from GNF.
Looking at the payments on an annual basis, Katerina's salary fell dramatically from
$66,485 (2015) to $28,270 (2016) to $18,400 (2017) despite her full-time employment
with GNF during that period and her half ownership of the company, and even though the
company's gross receipts and profits grew over that period in contrast to United's. (PDEx

---

[7]     On 7/29/2015, Katerina received a payment of $3,170 which was twice the usual amount
of $1,585. But neither she nor Nick received a payment of $1,585 in the week that followed.
(PDEx 11, Doc. 100, at 2). On a few later occasions (10/14/2015, 10/27/2015, and 11/10/2015),
Katerina also received a double payment where neither she nor Nick received the usual payment
in the week that preceded or followed. (*Id.*).

9, Doc. 89, at 82).[8] But when Nick's salary (whether from United or GNF) is considered together with Katerina's salary from GNF, the family's combined weekly salary actually increased each year. (*Id.*).

To maintain the roughly 60/40 split between the amounts paid to the Desario family and the Turi family from funds generated by the joint operation of United and GNF, any increases in amounts paid to one family were matched by increases to the other family. Thus, when the Desarios were receiving $1,835 per week in 2016, the Turis were receiving $1,335 per week. Like Nick, Nino received $1,335 per week (but from GNF instead of United), and Anita received nothing. When the Desarios began receiving $2,035 per week (October 14, 2016 to August 4, 2017), the Turis began receiving $1,535 per week, maintaining the $500 difference. On August 11, 2017, Anita started working part-time at GNF, and began receiving a paycheck of $150 per week. Together with Nino's GNF salary, the Turi family was then receiving a total of $1,685 per week. Soon thereafter, Katerina received a pay bump of $150 per week, maintaining the $500 per week differential between what the Desario family received and the Turi family received. (PDEx 5, Doc. 89, at 73-74). On an annual basis, the coordination in payments and approximate 60/40 split between the families from the proceeds of United and GNF is reflected below:

---

[8]    In 2015, GNF's gross receipts were $1,572,633 with a profit of $54,568. (Ex. 145, at 1). In 2016, gross receipts grew to $2,954,731 with a profit of $102,234. (Ex. 146, at 1). And in 2017, gross receipts climbed to $3,263,124 with a profit of $185,131. (Ex. 147, at 2). In contrast, United's gross receipts fell from $169,661 (2015) to $117,921 (2016), to $54,405 (2017). (Ex. 80, at 1; Ex. 81, at 1; Ex. 82, at 1). As for United's profits, after making a small profit of $16,869 in 2015, United had a loss of $6,304 in 2016, and a profit of only $220 in 2017. (*Id.*). (*See also* PDEx 9, Doc. 89, at 82).

**YEAR 2015**

| Family | United Wages | GNF Wages | Total Family Wages | Percent to Family |
|---|---|---|---|---|
| Desario | Nick: $20,605 | Katerina: $66,485 | $87,090 | 59.6% |
| Turi | | Nino: $59,005 | $59,005 | 40.4% |

**YEAR 2016**

| Family | United Wages | GNF Wages | Total Family Wages | Percent to Family |
|---|---|---|---|---|
| Desario | Nick: $56,070 | Nick: $22,555 Katerina: $28,270 | $106,895 | 59.8% |
| Turi | | Nino: $71,820 | $71,820 | 40.2% |

**YEAR 2017**

| Family | United Wages | GNF Wages | Total Family Wages | Percent to Family |
|---|---|---|---|---|
| Desario | | Nick: $18,400 Katerina: $93,690 | $112,090 | 57.9% |
| Turi | | Nino: $78,285 Anita: $3,150 | $81,435 | 42.1% |

Other pertinent facts relating to the parties are discussed later as part of the analysis of specific issues in the case.

## II.     The January 2018 Audit

In January 2018, the Trust Funds once again retained Legacy to conduct an audit of United's fringe benefit contributions, this time for the period January 1, 2016 through December 31, 2017. (Ex. 9). Marc Ragona, who performed the audit on behalf of Legacy, identified GNF as a potentially related non-signatory company and asked that it produce

payroll and other financial documents. Once GNF complied with the document request (after initially failing to do so), Legacy issued its final Audit Report on January 24, 2019. (Ex. 27). Legacy identified a number of "common elements" between United and GNF. (*Id.* at 6). Based on those common elements and its review of relevant records, Legacy concluded that United had underpaid fringe benefit contributions to the Trust Funds for the period January 1, 2016 through December 31, 2017 in the amount of $939,094.71. (*Id.* at 5). In this lawsuit, the Trust Funds seek to recover the unpaid contributions, as well as interest, liquidated damages, auditor's fees, and attorneys' fees.

### III. The Single Employer Doctrine

The Trust Funds argue that United and GNF are sufficiently integrated to be treated as a single entity under the single employer doctrine. *Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998). This would make both companies "equally liable under a collective bargaining agreement entered on behalf of only one of them." *Board of Trustees of the Pipe Fitters Retirement Fund, Local 597 v. American Weathermakers, Inc.*, 150 F. Supp. 3d 897, 905 (N.D. Ill. 2015) (citing *Moriarty*, 164 F.3d at 332). "To determine whether two nominally separate business entities are a single employer, one must examine four factors set out by the Supreme Court: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Lippert Tile Co. v. Int'l Union of Bricklayers and Allied Craftsmen, Dist. Council of Wis. and Its Local 5*, 724 F.3d 939, 946 (7th Cir. 2013) (citing *South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs, AFL-CIO*, 425 U.S. 800, 803 (1976)). *See also Chicago Regional Council of Carpenters Pension Fund v. Schal Bovis, Inc.*, 826 F.3d 397, 404 (7th Cir. 2016). No single factor is conclusive; instead, courts

"must weigh the totality of the circumstances." *Lippert Tile*, 724 F.3d at 947. "Ultimately, single employer status . . . is characterized by the absence of an arm's length relationship found among unintegrated companies." *Cremation Society of Ill., Inc. v. Int'l Bhd. Of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (quoting *Lippert Tile*, 724 F.3d at 947).

The evidence presented in this case strongly supports a finding that United and GNF lacked an arm's length relationship and effectively operated as a single entity during the audit period.

### A.    Common Ownership

"Common ownership typically applies when two companies are owned by the same individual(s)." *Fox Valley & Vicinity Constr. Workers Welfare Fund v. Morales*, No. 17 C 416, 2019 WL 247538, at *3 (N.D. Ill. Jan. 17, 2019). The Trust Funds argue there is common ownership here because during the audit period Anita Turi was a 50% owner of both United and GNF. Defendants insist that Anita actually sold her United shares to Nick Desario in October 2014 so was no longer an owner of United as of that date. Based on the evidence presented, the Court finds that Anita continued to own half of United during the audit period, so there was common ownership.

There is no dispute that Nino Turi transferred his 50% ownership interest in United to Anita on July 6, 2010, the same day he established Accurate Flooring as a non-union flooring installation company, and the day after he resigned from the Union and terminated his affiliation with United. Nino testified that in doing so he understood it was important to keep union and non-union operations separate. (Tr. at 718-19 (Nino Test.) ("[Y]ou don't want mixing . . . I guess you'd say you don't want problems with the union,

in simple terms. You want – you know, if it's union, it has to be separate. If it's nonunion, it has to be separate.")). Contrary testimony from Anita, Nick, Katerina, and Nino that the transfer was intended solely to give Anita an opportunity to make money from United if the business recovered is not credible. Anita would have made money in any event as Nino's wife, and she was unable to explain why the transfer was necessary. (Tr. at 534, 728-29).

Over the next seven years, the Desarios and the Turis repeatedly signed and filed tax returns (for years 2010 through 2017) indicating that Anita was a 50% owner of United. (Exs. 80-82, 89-96). Defendants claim that after this lawsuit was filed in 2018, they discovered that the tax returns filed for years 2015, 2016, and 2017 were incorrect because Anita had reportedly sold her United shares to Nick in late 2014, so had ceased being a 50% shareholder. The Court does not find the testimony and other evidence offered in support of this assertion to be credible.

First, Patrick J. Noone of PJN Financial Services, Inc., Defendants' tax preparer starting in 2015, testified that he verified the ownership interests with his clients before filing the returns. (Tr. at 645, 664). Given Noone's 38 years of experience as a CPA, the Court credits his testimony over the contrary statements from Nick, Katerina, and Anita that they relied entirely on Noone to ensure the accuracy of the returns without providing any input.

Second, Noone provided to Defendants each year not only the corporate tax returns for United and GNF, and personal returns for the Desario and Turi families, but also a shareholder letter with Form K-1 addressed to each owner of each company. (Tr. at 665-66). For example, the March 25, 2016 letter from PJN Financial Services

addressed to Anita Turi at her home address regarding "United Carpet" stated (in relevant part):

> Dear Shareholder:
>
> Attached is your copy of the 2015 corporation form 1120S Schedule K-1. This schedule summarizes your information from the corporation. This information has been provided to the Internal Revenue Service with the U.S. income tax return for an S corporation.
>
> The information provided on the schedule should be entered on your tax return, in accordance with the instructions and schedule K-1 Page 2.

(Ex. 92). The Form K-1 attached to the shareholder letter bore the same date and was a two-page document. At the top of the first page, the form prominently identified: (1) the corporation (United Carpet); (2) the shareholder and her percentage ownership (Anita Turi – 50%); and (3) the shareholder's share of current year income from the corporation ($8,434). (*Id.*).

In the Turi's personal 2015 tax return prepared by Noone around the same time (dated March 28, 2016), there was a page for income or loss from S Corporations. This page identified both "United Carpet, Inc." and "Great Northern Flooring Inc." as S Corporations from which income was received, including $8,434 from United Carpet. (Ex. 288, at 24). And the very next page of the personal tax return and the one that followed focused solely on the $8,434 in income from United Carpet, and each of those pages identified Anita Turi at the very top just above the words "United Carpet, Inc." (*Id.* at 25-26). Similar tax documents exist for tax years 2016 and 2017. (Exs. 289, 290). Yet Anita testified that she only realized the "mistake" in the tax filings when preparing for her deposition in this litigation. (Tr. at 544-46).

Nick Desario also received shareholder letters and Form K-1s in years 2015, 2016, and 2017 that identified him as only a 50% shareholder of United rather than 100% as claimed. (Exs. 91, 93, 95). And in the Desario family tax returns in those years, Nick was identified as only a 50% shareholder of United and reported only half of any profit or loss. (Exs. 281, 282, 283). For example, in 2015, the family tax return reported only half of United Carpet's income ($8,435) since the other half was reported on the Turi family return. (Ex. 91). Like Anita, Nick ostensibly did not notice the mistake in three consecutive years, testifying that he typically did not read tax returns before signing them (beyond looking to see if anything was owed) since he trusts his accountant. (Tr. at 333).

This Court does not credit testimony that Anita transferred her United shares to Nick in late 2014, and that the tax filings in 2015, 2016 and 2017 reflecting otherwise were mistakes. Had the transfer occurred in 2014, Defendants certainly would have noticed in 2015, 2016, or 2017 the errors in the shareholder letters and Form K-1s sent to Anita and Nick for United Carpet each year, as well as the errors in their personal returns. Indeed, the "error" in the tax documents in 2015 resulted in the Turis having to pay income taxes on $8,434 of United income that year that they purportedly never received since it would have all gone to Nick.

There are also other reasons to doubt Anita's testimony regarding the purported transfer of the United shares to Nick in late 2014. At her March 21, 2019 deposition, Anita testified that it was Nino's idea that she sell her United shares back to Nick. (Doc. 33-1, at 385-86, A. Turi Dep., at 73-74). At trial, however, Anita testified that it was actually her idea; indeed, she claimed to recall a specific conversation she had with Nino and Nick

sometime in 2014 when she made that decision.[9]  This Court does not find it credible that Anita had a clear recollection at trial (September 2021) of a conversation from seven years earlier that she did not recall at her deposition (March 2019).

In November 2018 – after the filing of this lawsuit and almost 4 years after Anita's alleged transfer of the United shares to Nick – accountant Noone was asked to and did prepare amended corporate and personal tax returns for years 2015, 2016, and 2017. The amended United corporate returns reflected Nick as the sole owner of United.  (Exs. 284-86, 291-93).  But the checks payable to the IRS for taxes owed in relation to certain of these returns were dated six months later in May 2019 – around the time Plaintiffs moved for summary judgment.  And the checks did not clear until July 2020.  (Exs. 314-16, 320-22; Tr. at 689-90).  Notably, GNF paid Nick's personal tax liability associated with the change in his ownership of United in year 2015 through a GNF check in the amount of $1,668 signed by Katerina.  (Exs. 284, 330; Tr. at 313-14, 317-18).

The parties disagreed at trial over whether the amended United tax returns were actually filed, with each side highlighting portions of the conflicting evidence that was presented.  This Court need not summarize that evidence or resolve the dispute.  Even assuming the amended United tax returns *were* filed at some point after this lawsuit was filed, this does not change the Court's finding that Anita remained a 50% shareholder of United in years 2015 through 2017.  Defendants also made much of the fact that, filed or

---

[9]     When asked at trial why she gave up her shares, Anita testified: "Because it was worthless. It was just paper. And I had no desire to have it anymore. And we were just, you know, we're friends, so we were having this discussion. And I'm like, you know, I said, 'Why don't you just take it back.'  I'm like 'It's kind of silly for me to be part – to have the part stocks in it when I don't need it. … Just you take the whole thing.'"  (Tr. at 535).

not, the amended returns did not result in any real monetary tax benefit or consequence.[10] The significance of this is unclear and was not developed at trial. Regardless, in this Court's view, the belated preparation and filing of the amended returns after the filing of the lawsuit was intended only to create documents to be used to defend against the claim of single employer liability that was predicated (in part) on common ownership.

Finally, this Court gives no weight to the stock certificate that Defendants offered as evidence that Anita transferred her United shares to Nick in October 2014. The certificate dated July 6, 2010 (signed by Nick and Nino) indicated that "Anita Patano" (maiden name) was the owner of 50,000 shares of United. In the upper left-hand corner was a handwritten notation stating "Cancelled 10/31/2014." (Ex. 50). No witness admitted to making the notations or knowing who did.[11] Defendants also offered into evidence a form entitled "Assignment Separate From Certificate" stating that Anita Patano transferred her shares to United for value received. (Ex. 331). The form bore a typewritten date of October 31, 2014. While Anita signed it, she did not testify that she did so on the date indicated, and the line "In the Presence Of" is blank. (Ex. 331, at 3; Tr. at 562). In the absence of a witness to verify the signature date, and in light of the tax returns and Anita's questionable testimony on this subject, the Court is not persuaded that Anita transferred her half ownership of United to Nick on October 31, 2014.

---

[10] The year that had the biggest impact was 2015 when the Desario family's total taxes increased from $5,591 to $7,259 since 100% of the United income was passed through to their personal return rather than only 50%. (Exs. 86, 284).

[11] A similar-looking certificate dated April 6, 1995 (signed by Nick and Nino) indicated that Nino was the owner of 50,000 of the 100,000 shares of United common stock. That certificate also had a handwritten notation in the upper left-hand corner stating "Cancelled July 6, 2010." (Ex. 49). The handwritten "cancelled" notation on this certificate and the one ostensibly made four years later (10/31/2014) on Anita's certificate were in the same color ink and the handwriting appeared similar.

In sum, based on the foregoing evidence, the Court finds that Anita remained a 50% owner of both United and GNF during the January 1, 2016 through December 31, 2017 audit period. The common ownership factor thus weighs in favor of finding the two companies were a single employer. The Court notes, however, that given the ample other evidence discussed below that demonstrates the lack of an arms-length relationship between United and GNF, a finding of a single employer relationship would be warranted even had Anita transferred her ownership to Nick in late 2014.

**B.   Interrelation of Operations**

In assessing interrelatedness of two companies' operations, "day-to-day operational matters" are most relevant. *Chicago Regional Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1357 (N.D. Ill. 2016) (quoting *Lippert Tile*, 724 F.3d at 947). Among other factors, courts have considered "whether purportedly separate businesses shared the maintenance of their business records, processed payroll jointly, processed their billing and bank accounts together, and shared space." *Id.  See also Midwest Operating Eng'rs Fringe Benefit Funds v. Sulzberger Excavating Co.*, No. 16 C 4209, 2017 WL 4074018, at *6 (N.D. Ill. Sept. 14, 2017) ("Interrelated operations include companies that operate out of the same building, use the same employees, have the same organizational chart or management, operate in the same geographic market and industry with the same or similar customers, share computers and phone numbers, use the same bank accounts, or use the same payroll and billing entity."). Based on the evidence presented, United and GNF had a high degree of interrelation of operations.

### 1. Common Service Providers and Primary Contact

To start, United and GNF consistently used the same attorney, accountant, registered agent, insurance company, bank, and payroll service. *See TMG Corp.*, 206 F. Supp. 3d at 1357 (finding interrelation of operations where, among other things, the signatory and non-signatory companies "shared the same attorney for filing their annual reports; they shared the same registered agent; they maintained bank accounts at the same time at the same banks; and they used the same insurance broker."). In fact, every time United changed one of these providers, GNF followed suit. More specifically, both companies used the same corporate lawyer, and both hired the same litigation attorney to defend this lawsuit. (Tr. at 351-52). United and GNF also used the same accountant, Donald Piorek of AccounTax Business Services, until they both switched to Keith Orr of Tighe Kress & Orr, P.C., and then to Patrick Noone of PJN Financial Services. (Stip. 106). Piorek served as the registered agent for United and GNF in 2010, 2011, and 2012, at which point attorney Morris Dyner became the registered agent for both entities from 2013 through 2017. (Stip. 107). Similarly, United and GNF both used Orazio Difruscolo as an insurance agent, and Country Financial as a Workman's Compensation insurer. (Stip. 110). Furthermore, United and GNF both used the same banking institution and used Paycor as a payroll service provider. (Stip. 108, 109).

Defendants stressed that United and GNF maintained separate bank accounts, insurance policies, tax identification numbers, and login credentials with Paycor. They also noted that the insurance provider Orazio Difruscolo is Nick's cousin, so was well known to his wife Katerina (GNF's half owner). (Tr. at 328-29). Though these facts weigh somewhat against a finding of interrelation, they are insufficient to overcome other

compelling evidence that supports the opposite conclusion. For example, both United and GNF designated Susan Fry (a/k/a Susan Stricklin) as their "Primary Contact" and "Paygroup Contact" for payroll purposes at a time when Susan was employed only by GNF. (Ex. 161, GNF Paycor Client Service Agreement dated 9/4/2013; Ex. 111, United Paycor Client Service Agreement for 2014). Nick attempted to explain this by testifying that Paycor did not update the contact person information when Susan left United and he had no control over that. (Tr. at 323, 331). The problem with this assertion is that the contact email for Susan in United's 2014 Client Service Agreement was susan@gnflooring.com. Since GNF did not exist when Susan stopped working at United in 2008, someone clearly provided this new information to Paycor after she left. (Ex. 111). Nick ultimately acknowledged as much. (Tr. at 325 ("Q: So [Susan] must have been working for [GNF] when she was designated as the primary contact for [United's] payroll, correct? A: Correct.")). Susan testified that she was a contact person if anything came up about United's payroll since she had her cell phone at all times, and could also respond to emails and direct them to Nick. (Tr. at 213-14).

Similarly, when United's accountant (Tighe, Kress & Orr, P.C.) needed information regarding a CRCC compliance audit of United in February 2013 (some five years after Susan left the company), the accountant sent an email request directly to Susan. (Ex. 16). Susan was also United's contact for purposes of Workers' Compensation Audits in 2011 and 2012. (Exs. 18, 19). The 2012 insurance audit was "performed at insured's [United's] other business location at 1132 Tower Ln, Bensenville, IL 60106," which was GNF's business address. (Ex. 19, at 2).[12] As noted previously, moreover, Susan served

---

[12] Oddly, the 2011 audit identified Katerina as United's "bookkeeper" and Anita as United's "receptionist," though neither was actually working for the company. (Ex. 18, at 6).

as Legacy's primary contact during the 2013 audit of United's fringe benefit contributions, working directly with Legacy's auditor Alan Droba and never telling him to contact someone else.  (Tr. at 178, 183).  Susan's March 5, 2013 email to Droba identified her as "Susan Fry, United Carpet Inc."  (Ex. 15).  While Susan and Nick testified that Susan just helped United "here and there" as a "favor" (Tr. at 212, 324), the fact remains that Susan was clearly doing work for and representing both United and GNF at the same time.

Finally, United's and GNF's payroll invoices and W2 summaries for 2015 through 2017 were all addressed to Katerina Desario at GNF's business address in Bensenville, Illinois.  (Ex. 112).  *See TMG Corp.*, 206 F. Supp. 3d at 1357 (fact that signatory company "had some of its mail sent to [the non-signatory's] headquarters and addressed to the attention of [the non-signatory's] employees" supported a finding of interrelated operations).  Defendants attempted to downplay the significance of this evidence by explaining that Nick was worried about having "live" checks sitting outside his home so had them sent to GNF's office where Katerina worked (as did Nick as a GNF employee, at least as of 2016).  (Tr. at 323, 437, 607).  According to Nick, Katerina never opened United's Paycor packages but gave them directly to him.  (Tr. at 478-79).  To begin, Defendants did not identify any particular United employee (there were at most 4) who was paid by check as opposed to direct deposit.  Even if they had, the fact remains that United solved this problem by having its payroll be mailed to GNF, with GNF's half-owner and bookkeeper identified as the recipient, so this is further evidence of interrelation.

A similar analysis applies to Katerina's status as a signatory on United's bank account.  (Ex. 115, at 2) (5/25/2016 United check to the Secretary of State signed by Katerina).  *See TMG Corp.*, 206 F. Supp. 3d at 1357 ("When one company controls the

ability of another to issue checks, that is an intertwined relationship, not an arm's length relationship."). Nick testified that he made Katerina a signatory in case something happened to him, so she could pay any bills and have control of the account. (Tr. at 329-30). Though Katerina ultimately only wrote and signed one check for United (reportedly when a check was needed quickly and Nick was unavailable), her ability to do so, combined with other evidence discussed above, also supports a finding of interrelatedness.

> **2. Coordinated Payment of Wages to Desario and Turi Families**

Payment histories for the Desarios and the Turis provided further and strong evidence that United and GNF were interrelated entities that did not have an arm's length relationship during the audit period. As explained earlier (*supra*, pp. 10-13), this evidence demonstrated that the amount of payment Nick took from United directly correlated with and determined the amount of payment Katerina took from GNF. And the Desarios and the Turis not only balanced the wages between Nick and Katerina at United and GNF, but also among the Desario and the Turi households, at all times maintaining a roughly 60/40 split.[13] The coordinated nature of these payments, which were unrelated to work performance or specific business earnings, supports a finding that United and GNF did not have an arm's length relationship and instead were operating as an integrated enterprise. Katerina admitted as much, testifying that the only consideration behind the Desario's earnings each week (from United and GNF) was the family budget. (Tr. at 467-68, 471, 473, 506). Absent the interrelationship between the two companies and consideration of how much Nick was able to take in wages from United, there was no

---

[13] (*See* PDEx 1-4, Doc. 89, at 65, 67, 69, 71, 73, 74).

reason for Katerina's wages to have fallen dramatically from 2015 to 2017. During this period, she not only worked full-time for GNF and owned half the company, but GNF's gross receipts and profits steadily grew.

### 3. Nick's Dual Roles with United and GNF

Other evidence supporting a finding of interrelation of operations is Nick's dual roles with GNF and United. Specifically, Nick was bidding on jobs on behalf of GNF, while simultaneously serving as an owner of United through which he supplied GNF with union labor. *See supra*, pp. 8-10. This arrangement started as early as 2013, some three years before Nick was put on the GNF payroll. In 2013, GNF set up a website identifying Nick (though an owner of United) as a GNF staff member performing commercial estimating work, and he began using a GNF email address. (Ex. 30; Tr. at 252-54). Nick testified about how this came about, making clear not only the purpose (for GNF to get commercial union projects and show general contractors that the company was capable of this type of work) but the tacit agreement that United would be the company providing the union labor for GNF jobs:

> We talked about trying to, trying to get some union projects or commercial union projects, and so we – because I would bid some commercial union projects with Great Northern Flooring, this way the general contractors or the customers would see that we were or that Great Northern Flooring was also able to do that kind of work. . . . It's typical in our industry for flooring companies to subout their union work, and their non-union work gets done by their other crews or employees. So I didn't see anything wrong with, you know, me putting my name on there in trying to get some union work. The labor was going to be done through United Carpet, which all the benefits would have been paid through United Carpet.

(Tr. at 334) (emphasis added). Nick reiterated more than once that United (not some other union labor supplier) would be performing the labor on any union jobs that GNF managed to procure. (*See* Tr. at 238-39 ("I was trying to get more union work for United

Carpet, so I agreed to be, like, their commercial estimator on their [GNF] website. So if – if any particular builder or a general contractor wanted some commercial work done, they would see that we were – that they were able to do that kind of work. And I would estimate particular commercial jobs that United Carpet would eventually install."); Tr. at 342 ("[B]esides the work that I did with them [GNF], all their other business is all strictly residential non-union work."); Tr. at 347-48 ("As long as I required the labor from United Carpet and United Carpet paid its dues to the union, I don't see anything wrong with that. That's why I did that. I figured United Carpet is going to do the labor, and I'm going to pay the dues.")).

Nick testified that in preparing GNF's bids, he would discuss with Nino and Katerina but mostly with Nino how much GNF wanted to make on a project so he could add this into the GNF costs, and it usually was a profit margin for GNF of 15 to 20 percent. (Tr. at 257-58). Nick of course had no need to make inquiries to determine GNF's costs for union labor when preparing these bids since United provided that labor. (Tr. at 418 ("Q. Who do you call while you're working at Great Northern Flooring – who do you call at United Carpet to find out what United Carpet is going to charge for labor for that job? A. I don't have to call anybody. That's myself.")). While Nick testified it is typical in the industry for non-union companies to "sub out their union work" as GNF did with United (Tr. at 334), Defendants offered no evidence that Nick volunteered his time bidding on projects for other companies besides GNF, or that other companies put Nick on their payroll and had him bid on projects with an understanding that United would be selected to supply the union labor.

Nino testified that he decided to identify Nick as a commercial estimator on GNF's website and to ask him to prepare GNF bids for union projects since Nick would "probably do the job." (Tr. at 103, 609 (Nino would say "'Hey, Nick, please do the take-off for this because you're going to probably do the job, okay.' And that's why I put him on [the website] at that time.")). (*See also* Tr. at 723 (Nino Test.) ("So at the end of the day, we have to subcontract to a union supplier, and that would be United Carpet[.]")). Nino also acknowledged that it was in his interest to subcontract union work to United given his wife's ownership interest in United. (Tr. at 730-31 (Q: "You kept the stock for United Carpet in your family because you were hoping if the company became successful it might benefit your family, correct? A. Correct. Q. So wouldn't it be in your interest to only subcontract union work to United Carpet so that it could become successful? A. Would it be in my interest? Yes.")).[14]

Nonetheless, Nino insisted that United only "did their fair share of jobs, but they were not the sole provider." (Tr. at 711). Nino testified that GNF had subcontracted union labor in the past to CE Korsgard and Certified Installations, though he could not recall whether this was prior to the lawsuit. (Tr. at 611, 710-11). He also volunteered that subcontractor CE Korsgard had provided labor for the Verizon Wireless store in Chicago Ridge but did not say when this occurred, and Defendants provided no GNF business records reflecting payments to this subcontractor or others (besides United) to show how much union labor was subcontracted to other companies and when. (Tr. at 730).[15] As

---

[14]     Nino did not distinguish between his interest before and after Anita purportedly transferred her shares to Nick in October 2014.

[15]     The Trust Funds offered into evidence numerous United invoices issued to GNF seeking payment for labor provided on union projects. One of these was for labor provided on the Verizon store in Chicago Ridge. (Ex. 255). While Legacy auditor Marc Ragona attempted to match each

Nick observed, after United ceased operating in 2018, GNF decided to stop bidding on union jobs after handling "maybe one or two jobs" through a different union subcontractor. (Tr. at 407).

### 4.     United's Preferential Pricing to GNF

It is not surprising that GNF stopped bidding on union jobs shortly after United's dissolution despite the existence of other companies from which it could have subcontracted the labor.  As discussed below, United provided very favorable pricing to GNF rather than imposing the typical 15 to 20% markup over its own costs to ensure a reasonable profit.  Evidence of this was first offered by the Trust Funds in support of their motion for summary judgment when they pointed to United invoices submitted to GNF for union labor provided on the Meadows Credit Union and Ogilvie Station/Verizon projects. These invoices suggested that United had charged GNF only what United was required to pay the installers (their union wage rate) plus United's fringe benefit contributions on the installers' behalf.  *United Carpet, Inc.*, 2020 WL 3077541, at *8.  At the summary judgment stage, the Court declined to infer solely from those two invoices that United made no profit on subcontracting of union labor to GNF.  Instead, the Court advised that the parties would "have an opportunity at trial to provide additional evidence concerning United's profits on the GNF projects[,]" observing that this would "be a significant issue, for if United indeed made no profit from work performed for GNF, this will be a strong indicator that United and GNF operate as a single employer."  *Id.*

At trial, Nick was questioned about the two invoices above (Exs. 255 and 257) and confirmed the lack of the usual profit.  On the Meadows Credit Union project, Nick said

United invoice with a corresponding GNF check (and vice versa), he could not always find a match for a particular invoice or check.  (Tr. at 120-21).

he only charged his costs since this was a special situation. (Tr. at 355). This was also true on the Verizon project (Ex. 255), as Nick acknowledged "[t]here wasn't much profit in here. I pretty much covered my costs because Nino asked me," and it was "pretty much kind of like doing a favor." (Tr. at 361). At the same time, Nick suggested that this type of pricing at cost happens all the time with flooring companies where they ask "[c]an you do this one, and then I'll try to give you more work." (Tr. at 361-62). But Nick did not identify or produce records for any specific jobs done for other companies besides GNF where United had provided such favorable pricing. And Nick made clear that the standard in the industry is for labor installation companies like United to include a 15 to 20% markup over their costs when charging for labor, and said that unless he was asked for a "favor" he "normally for other companies, I would add the 15 to 20 percent margin." (Tr. at 340, 407-08, 425 (Nick Test.) (Q. "[A]ny union company that you contact [if United cannot provide the labor], they're going to want to make a profit on the job, right? . . . A. Of course, everybody is entitled to a profit. Q. All right and based on your testimony yesterday, any of those labor companies in the flooring industry they're going to want to have a markup of 15 to 20 percent profit, correct? . . . A. Correct.")).

When Nick's examination was about to conclude without testimony about specific projects and invoices where United ostensibly had charged GNF the normal 15 to 20% markup over United's costs, the Court finally asked Nick some questions on this topic. Nick was asked to explain what an invoice would look like if United *were* charging a mark-up and not just recovering costs, and whether he could identify a project done for GNF where this happened so the invoice could be examined. Nick responded that he could not recall one offhand but could probably find it. (Tr. at 362-63). The next day, defense

counsel announced that Nick had identified two United invoices to GNF that reportedly showed a profit to United (Exs. 250 and 259) but did not pose questions to Nick about these invoices. (Tr. at 396-97, 412-13). The Court then did so. Nick explained that the invoice marked Ex. 259 (dated 5/4/2016) reflected 16 hours of labor billed at $100 per hour, so there was roughly $20 per hour in profit since United's costs with fringe benefits was $75 to $80 per hour. (Tr. at 413-14). As for the other invoice (Ex. 250 dated 7/19/2016), United did not bill for a set number of hours but rather specified a rate per square yard (or square foot) of installation, and Nick said United would make a profit "if things go well." (Tr. at 414). When questioned by counsel for the Trust Funds, however, Nick agreed that the invoices alone were insufficient to determine whether United had made a profit on either job. This is because United had to pay the union laborers for every hour worked, and the invoices did not reflect the actual hours worked on the jobs. (Tr. at 423). As Nick observed, the laborers could run into problems so the job took longer than anticipated and this "happens all the time." (*Id.*).

Ultimately, Nick acknowledged that GNF was given preferential pricing over other companies:

> Q: On those invoices where you did jobs for Great Northern because they were union jobs, you didn't bill them at cost, did you?
> A: I added a little bit. … I always added something.
> Q. You added some profit in in [sic] the total bill; is that right?
> A. Yes.
>
>              *                      *                     *
>
> Q. Mr. Desario, you just said on the jobs that United Carpet did for Great Northern Flooring, you didn't bill at cost, you said "I added a little bit."
> A. Yes.
> Q. [D]id you also only add a little bit when you did -- United Carpet did work for the other companies where you provided labor?
> A. Other companies unless I had -- they asked me for a favor, hey, can you take care of me on this, I would do that. But normally for other companies, I would add the 15 to 20 percent margin.

*       *       *

> Q. Why did you only bill GNF a little bit and with other companies, you normally would add 15 to 20 percent?
>
> A. Because I had a relationship with [GNF], and I was hoping to get more work through them. This way we could both, you know, prosper. My intention was to get guys working and, you know, get more customers like La Macchia.

(Tr. at 424-26).

Of course, the same rationale for charging only a little over cost (rather than 15 to 20%) would seemingly apply to pricing for other companies too where United might then get more work through them. One important difference, however, is that Nick's wife owned half of GNF so his family made money on GNF jobs even if United did not separately earn a profit. Even apart from this, Nick was on GNF's payroll beginning in 2016. Given how the income of United and GNF was distributed between the Desario and Turi families (the 60/40 split of the collective funds generated by United and GNF), it really did not matter whether United earned any profit by providing labor for GNF union jobs as long as GNF earned a sufficient profit. If United made little to no profit (rather than the typical 15 to 20%) on these jobs, then GNF presumably made more on the jobs. Either way the Desario family would receive the same amount: 60% of the total funds generated by United and GNF. The Court also draws the reasonable inference that GNF was able to submit more competitive bids, so get more union business, when its labor costs did not include the usual 15 to 20% markup on United's labor costs in addition to GNF's own 15 to 20% markup over its costs.

Despite the special relationship between United and GNF, the Court recognizes that United sometimes provided union labor (at the normal mark-up) for other non-union companies during the audit period, including Key Carpet Corp., Pelar Construction Inc.,

Yonan Flooring, and Tandem Flooring, so United was not entirely reliant upon GNF for its business. (Ex. 21, at 45-47). The money earned from these other companies, however, cannot have been substantial. Nick testified that United was not profitable from 2010 onward (Tr. at 341), and he ceased taking any payments from United in October 2016 when he began receiving a regular paycheck from GNF. While United did not lease any office space, the company still had annual operating expenses (aside from wages and benefit contributions) for such things as workers' compensation insurance, bank fees, and payroll processing. (Tr. at 420-21). Given these facts and the other evidence presented at trial, the Court finds that United remained in business during the audit period primarily as a vehicle to provide GNF with union labor. In this way, GNF could bid on and perform jobs requiring union labor without being a signatory to a union contract, which jointly benefitted the Desario and the Turi families.

### 5. United and GNF Performed the Same Work

A final factor weighing in favor of finding interrelation of operations is that United and GNF did the same work. Defendants made much of the fact that GNF sold materials in addition to providing labor while United did not. But the installers performed the same type of work (flooring installation on residential and commercial projects) regardless of whether it was for GNF or United. *See, e.g., Lippert*, 724 F.3d at 947 (finding interrelation of operations where, among other things, both companies "served the same geographic area and performed the exact same labor."). Nick testified that the companies were in different markets in terms of the types of installation jobs they handled.[16] This certainly

---

[16]    Nick testified as follows:

Q: What market was United in?

was not true as to the union jobs that GNF obtained. Indeed, as an employee of GNF, Nick bid on several commercial union installation jobs with the understanding that United's installers would perform those very jobs and they did so.

Based on the totality of the evidence discussed above, the Court finds that the significant interrelation of operations between United and GNF weighs heavily in favor of deeming them a single employer.

### C.     Common Management and Centralized Control of Labor Relations

The remaining two factors, "common management" and "centralized control over labor relations," are closely related here. Common management looks at "actual or active control, as distinguished from potential control, over the other's day-to-day operations . . . .," *Cremation Society of Illinois*, 869 F.3d at 617 (quoting *Lippert Tile*, 724 F.3d at 947), with an emphasis on "common control over hiring and firing of employees, as well as other daily management decisions." *Automobile Mechanics' Local No. 701 Union and Industry Pension Fund v. Dynamic Garage, Inc.*, No. 16 C 8967, 2018 WL 4699842, at *6 (N.D. Ill. Sept. 30, 2018) (citing *N.L.R.B. v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1288-89 (7th Cir. 1989)). Similarly, centralized control of labor relations considers "who is responsible for hiring, firing and evaluating employees." *Cremation Society of Illinois*, 869 F.3d at 617. *See also American Weathermakers, Inc.*, 150 F. Supp. 3d at 907 ("The

---

A. United Carpet was for commercial union labor work. …Schools, hospitals, that kind of work, office buildings Downtown. Great Northern Flooring is more personal home, retail business. …Dentist offices, anything small like that, like our family dentist office or something like that.
Q. All right. And the only time that you'd be called on to supply labor is if Great Northern obtained a contract that provided for union labor, is that right?
A. Correct.

(Tr. at 377-78).

centralized control of labor relations means whether the companies share responsibility for making day-to-day labor relations decisions, such as setting wages, hiring and firing.").

Based on the evidence presented, it is clear that at least by 2013, Nick was not only an owner of United, but was on GNF's staff where he worked together with Nino to obtain commercial installation jobs for GNF and then manage and complete those jobs using the same installers who had previously worked for United in years past or were still doing so. The difference from when they had worked together at United prior to 2010 was that in the new arrangement, they were not limited to union jobs.

Recall that prior to 2010, Nick and Nino both managed employees and operations for United's union flooring installation business. (Stip. 9; Doc. 33-1, at 500-01, Nick Dep., at 44-46; Doc. 33-1, at 571-72, Nino Dep., at 29-31). Once GNF was up and running in mid-2010 (owned by the spouses of Nick and Nino), Nino left United, started Accurate Flooring, and became GNF's sole provider of labor installation services. Some of the installers Nino hired at Accurate Flooring had also worked for United. In August 2013, Accurate Flooring merged with GNF. The installers from Accurate Flooring then became employees of GNF with Nino continuing to manage their schedules. Around the same time, Nick started working for GNF too as a commercial estimator. From that point on, Nick and Nino worked together in securing and completing commercial installation jobs on behalf of GNF using current and former United employees -- some of whom were on the payroll of both United and GNF during the same period.

In addition to Nick being involved in the management of United and GNF, there is some evidence that Nick also served as an officer of GNF. On GNF's 2017 tax return, the line item for "Compensation of officers" totaled $193,525, which included the wages

paid to Nick. (Ex. 147, at 2).[17] Nick was also involved in setting his own salary at GNF. (Tr. at 596, 614 (Nino Test.) ("Q. Okay. So it was really all four of you [Nick, Katerina, Nino, and Anita] who were involved in the decision [as to Nick's salary], correct? A. Correct.")). As discussed earlier, moreover, the evidence shows that the amount of payment Nick took from United directly correlated with and determined the amount of payment Katerina took from GNF. In other words, the wages were adjusted up (or down) as a means of reaching a specific total amount paid to the Desario family through the two companies. What United paid (or was unable to pay) to Nick determined what GNF paid to Katerina, and later to Nick as well. And the Desario and Turi families coordinated the weekly payments from United and GNF to ensure an approximately 60/40 split of the total proceeds that were paid to the families. In other words, "the companies share responsibility for making day-to-day labor relations decisions, such as setting wages." *American Weathermakers, Inc.*, 150 F. Supp. 3d at 907.

Also supporting a finding of common control of labor relations is the fact that thirteen of GNF's installers during the audit period had worked for United in the past, and four of them (Peter Caucci, Pietro Desario, Mark Jones, and James Nelson) continued performing installation work for United after they became installers for GNF. (Stip. 78; Tr. at 242-43, 712-14, 770, 781-84). *See Finkel v. Frattarelli Bros., Inc.*, No. 05-CV-1551, 2008 WL 2483291, at *11 (E.D.N.Y. June 17, 2008) (relevant factor in assessing centralized control over labor relations is "whether the entities shift employees back and forth."). For example, during the week of April 8, 2016, Pietro Desario (Nick's brother)

---

[17]     The corresponding 2017 W-2 forms for GNF that year showed that Katerina earned $18,400, Nino earned $78,285, Nick earned $93,690, and Anita earned $3,150. (Ex. 159, at 5, 8, 10, 26). Those four wages ($18,400 + $78,285 + $93,690 + $3,150) add up to $193,525 – the amount reported on the GNF tax return as officer compensation. (Tr. at 732-35).

worked 8 hours for United and 30 hours for GNF.  Mark Jones worked 10 hours for United and 35 hours for GNF.  (PDEx 10, Doc. 89, at 86).  During the weeks of July 22 and 29, 2016, Pietro Desario worked a total of 22 hours for United and 57 hours for GNF.  James Nelson worked a total of 40 hours for United and 32 hours for GNF during those same weeks.  (*Id.*).  This pattern continued from January 2015 through December 2017.  (*Id.* at 84-87).  Defendants presented no evidence at trial that these installers worked for any companies besides United and GNF during the audit period of January 1, 2016 through December 31, 2017.

Nino insisted that these installers did not constitute common employees, explaining that when they "worked for me, it was a nonunion job.  When they worked for United, it was a union job."  (Tr. at 720).  Nick similarly testified that he alone managed the installers for GNF's union jobs, while Nino managed installers for GNF's non-union jobs.  (Tr. at 244-45, 335-36).[18]  Nino went so far as to deny that he ever worked on any common jobs with United, stating "United Carpet's jobs are United Carpet's union jobs. Our jobs were nonunion. They weren't the same."  (Tr. at 722).  This Court disagrees.  All of the jobs, including the union jobs, were secured and completed by GNF.  To the extent a GNF job required union laborers, Nick and Nino agreed that United would provide and pay the installers and later recoup the costs from GNF, including the benefit contributions that were made.  These same union installers on United's payroll were also GNF employees, and when they were assigned to a non-union job, GNF paid them directly.

---

[18]     Installer Nelson who worked for both United and GNF during the same period testified that he had been working for Nick and Nino almost 25 years, dating back to 1997 and up to the present. (Tr. at 769).  When Installer Jones was asked whether he was still working for Nick and Nino, he said he was working for Nino.  While Jones said he'd been working for Nino for at least 10 years, he then acknowledged receiving paychecks from United in years 2015, 2016, and 2017.  (Tr. at 780-81).

Based on this evidence, the Court is persuaded that during the audit period, Nick and Nino jointly controlled the day-to-day operations of securing and executing GNF installation jobs, including managing the installers (who were sometimes paid through GNF and other times through United, which then recouped those costs from GNF).  *See, e.g., Morales*, 2019 WL 247538, at *4 ("Bravo and Morales went so far as to share employees and shift them from one company to another depending on which had work.  On these facts, no reasonable fact finder could find that the two companies conducted their day-to-day operations separately.").

Defendants find it significant that the installers were happy to get non-union work from GNF when better-paying union work was unavailable from United.  (Tr. at 766, 777).  But this is irrelevant to whether United and GNF were legally obligated to pay fringe benefits to the Trust Funds on their employees' behalf.  Assuming United and GNF jointly owed contributions to the Union under the collective bargaining agreement and the Area Agreement, they could not avoid making payments even if their employees agreed to forego benefits (and there was no evidence here that the employees did so).  (Stip. 4).[19]

### D.    Summary

Considering the totality of the evidence presented at trial, including witness credibility, the parties' arguments, and the applicable law, the Court finds that United and GNF were so interrelated that they lacked an arm's length relationship with each other and constituted a single employer.  The evidence at trial established common ownership, a high degree of interrelation of operations, centralized control of labor relations, and

---

[19]    Mr. Jones explained that an installer ceases to be in the union when dues are unpaid.  But, as happened with Mr. Jones who worked for both United and GNF during the audit period, one can be reinstated in the union simply by paying the dues that are in arrears and a reinstatement fee.  (Tr. at 788).

common management.  Through their interrelationship, GNF was able to employ United's current and former union workers to perform bargaining unit work on non-union jobs without paying them union wages and fringe benefits.  And for flooring projects requiring union labor, GNF was able to use United as a pass-through company, allowing GNF to obtain union work without having to sign an agreement with the Union.  The Court finds in favor of the Trust Funds.

## IV.    Alter Ego

The Trust Funds argue an alternative, equitable basis for binding GNF to the terms of the collective bargaining agreement: its alleged status as an alter ego of United. *Chicago Dist. Council of Carpenters Pension Fund v. Ceiling Wall Sys., Inc.*, No. 94 C 4423, 1998 WL 773993, at *4 (N.D. Ill. Oct. 30, 1998); *Chicago Dist. Council of Carpenters Pension Fund v. Sunshine Carpet Servs., Inc.*, 866 F. Supp. 1113, 1115 (N.D. Ill. 1994) ("[T]he purpose underlying the alter ego doctrine in the ERISA context is to prevent a corporate business from limiting its pension fund responsibilities by fractionalizing its business operations.").   "To establish that one company is an alter ego of another, a plaintiff must demonstrate 'the existence of a disguised continuance of a former business entity or [an] attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.'"  *TMG Corp.*, 206 F. Supp. 3d at 1361 (quoting *Trustees of Pension, Welfare and Vacation Fringe Ben. Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 789 (7th Cir. 1993)).

"When attempting to discern whether a new company is another's alter ego, courts (or, at trial, finders of fact) engage in a fact intensive analysis, examining factors like whether the two companies have substantially identical management, business purpose,

operation, equipment, customers, supervision, and ownership." *Id.* Unlike the single employer doctrine, however, "unlawful motive or intent is the most critical factor for finding alter ego status in the Seventh Circuit." *Id.* "[I]t is the intent of the signatory to the collective bargaining agreement . . . to avoid its obligations under the agreement that matters." *Sulzberger Excavating Co.*, 2017 WL 4074018, at *7.

### A. Commonality and Alter Ego Checklist

The Court need not repeat all the evidence summarized earlier in support of its finding that United and GNF were sufficiently integrated to be deemed a single employer. From that evidence, the Court finds for purposes of the alter ego analysis that these companies shared common ownership, management, operation, business purpose, and supervision of installers.

In attempting to prove Defendants were not alter egos of one another, Defendants questioned multiple witnesses about a single-page "Alter Ego Checklist – Items to Look for" document that Legacy prepared in 1999 as a guideline for its auditors. (Ex. 265). This reflects 25 factors that could be "red flags" when reviewing company records to look for a potentially related company. (Tr. at 147-48). Defendants highlighted with witnesses those factors that they believed did not apply here. For example, Nino testified that United and GNF did not have common directors or common officers (despite Anita's common ownership of United and GNF). As for "Same Place of Business," Nino observed that his office was at GNF while Nick's "primary office was at his home" (he previously had testified that Nick worked in an office at GNF as of 2016). (Tr. at 607, 719). Regarding other checklist factors, Nino testified that GNF was controlled by Susan Stricklin, Katerina, and Anita, while United was controlled by Nick (Tr. at 719), and the companies had

separate books, bank accounts, tax identification numbers, and insurance policies. (Tr. at 721-22). Nino also said the companies did not work on common jobs since United's jobs were "union jobs" and "[o]ur jobs were nonunion." (Tr. at 722).

The Court did not find the testimony elicited about the checklist factors especially probative. For one thing, this testimony was sometimes conclusory or, in the Court's view, inconsistent with the evidence.[20] Other times, the highlighted factors admittedly did not apply (e.g., United and GNF did not have the same bank account and tax identification number) but the Court had to weigh this evidence against more compelling and countervailing evidence (e.g., the coordinated distribution of funds from United and GNF to the Desario and Turi families). Finally, the Alter Ego Checklist factors fail to consider unlawful motive or intent, which is "the most critical factor for finding alter ego status in the Seventh Circuit." *TMG Corp.*, 206 F. Supp. 3d at 1361. The Court now turns to that factor.

## B. Intent to Avoid Obligations Under Agreement

Compelling evidence was presented at trial from which the Court finds that Defendants operated GNF for the purpose of avoiding United's existing obligations under the collective bargaining agreement. By operating GNF in conjunction with United, Nick

---

[20] For example, Nick responded as follows to certain questions from the checklist:

Q. Do you operate out of the same place of business? A. No.
Q. Have you ever operated out of the same place of business? A. No.
Q. [D]o you have any control over Great Northern? A. No.
Q. Have you ever had control of the business? A. No.
Q. [D]o you have common control of labor relations, management, or supervision? A: No.
                    *                    *                    *
Q: Do you share administrative services? A: No.

(Tr. at 375-76).

and Nino were able to expand their business to include both union and non-union commercial installation work (performed by United's current and former employees) but without making the required contributions to the Trust Funds for bargaining unit work on non-union jobs.

Notably, Nick testified that United was not profitable from 2010 onward, yet he continued operating the company and never terminated its agreement with the Union, though he no longer was himself a union member. (Tr. at 235, 341).[21] Nick acknowledged that he began working for GNF because "that's when I could see there was no – in the future, there wasn't any work that it was really able to sustain. So that's when I started working for both – or not working for both, more for GNF." (Tr. at 383). But had United simply ceased operations or terminated the union agreement, GNF would no longer have had access to union labor from a supplier that did not demand the usual profit component, which in turn would have made it more difficult for GNF to bid successfully on union jobs from which the Desario and Turi families profited. Indeed, after United ceased operations in 2018, GNF only did one or two more union jobs using another subcontractor and then stopped bidding for union jobs. (Tr. at 406-07).

### C.    Efforts to Mislead

The Court's finding of an unlawful motive or intent is bolstered by evidence that Defendants sought to mislead clients, creating the false impression that GNF was a union company and concealing United's involvement in supplying labor on union jobs. In his

---

[21]    Robert Lid, the Union's manager of the contract and bond department, testified that termination could be accomplished by giving the Union notice 90 days before each agreement expired (one expired on May 31, 2010, one expired on May 31, 2014, and one expired on May 31, 2019). (Tr. at 98, 103). Lid confirmed that Nick never gave the Union notice that United wanted to terminate the agreement. (Tr. at 97, 102-03). The parties also stipulated to this. (Stip. 15-18; Exs. 42-44).

role as GNF's commercial estimator, Nick prepared multiple proposals on GNF's behalf, including several to LaMacchia for union jobs. *See supra*, pp. 8-10. None of these proposals mentioned that United would be providing the labor. Nick said this was not required yet LaMacchia's Standard Subcontractor Agreement required written consent to subcontract any portion of the work. (Tr. at 282; Ex. 248, at 2, Article 2).[22]

Had GNF obtained LaMacchia's consent to subcontract the labor to United, the LaMacchia contract also required (in Article 13) that the subcontractor (United) "shall obtain and submit to the Contractor, before any work is performed under this Contract, certificates from the Subcontractor's insurance carrier." (Tr. at 457). According to LaMacchia project manager Brandon Bosch, this requirement was "extremely important" since "[t]hey are not allowed to subcontract to anybody else or any other company, otherwise you would need a different certificate of insurance and find out who would be providing that labor." (Tr. at 748-49). LaMacchia never received a certificate of insurance for United – only GNF. (Tr. at 459, 637, 749).

Finally, as a condition of being paid, LaMacchia required final lien waivers from those who provided labor and materials for a project, so these companies could not place a lien on the property based on the agreed final payment. (Tr. at 643, 750-51). In the final lien waivers that Katerina executed on behalf of GNF, she was required to identify (within a sworn statement as part of the "Subcontractor's Affidavit") the "names of all parties who have furnished material or labor, or both, for said work and all parties having contracts or sub contracts for specific portions of said work or material," and to indicate

---

[22]       The agreement stated: "Subcontractor [GNF] agrees not to sublet, assign, or transfer this contract or any part thereof, or any monies due or to become due hereunder without the written consent of the Contractor [LaMacchia] first had and obtained." (Ex. 248, at 2, Article 2).

"the amount due or to become due to each," among other information. (Ex. 218; Tr. at 642). Katerina identified only "Great Northern Flooring" in the affidavit with no mention of United. (Ex. 218). Based on the lien waiver identifying only GNF, LaMacchia project manager James Fryk concluded that GNF furnished the flooring installation on the project in question. (Tr. at 643).

While Nick testified he could not recall whether he had ever been asked about or advised LaMacchia that work on the projects would be done by United (Tr. at 281-82), both Mr. Fryk and Mr. Bosch credibly testified that they had never heard of United before this lawsuit, and had believed GNF was a union company. (Tr. at 632-33, 639, 752). GNF's website, moreover, prominently stated in red bold capital letters that "Our installers are employees of the company, not subcontractors. We guarantee proper installation and high performance." (Ex. 30). Nick testified that this was "just wording on a website that somebody put on there" and he did not know what it meant. (Tr. at 242). But according to Jeffrey Johnson (Koeckritz's former vice president of sales for the builder division), publicizing that a company's installers were employees rather than subcontractors was a good way to gain customer confidence since this was very unusual. (Tr. at 497-98).

In sum, by publicizing on the GNF website that the company did not use subcontractors from another company (United), omitting any mention of United in the proposals and lien waivers, and failing to seek written consent to subcontract the labor on projects, Defendants created the misleading impression that GNF was a union company when bidding for union projects. In these ways and others, United was treated like a division of GNF rather than a separate arms-length company.

Efforts were also made to mislead auditors. When the 2013 Legacy audit revealed Accurate Flooring as a possible related non-signatory company to United, Susan Stricklin (a/k/a Susan Fry) served as United's representative, identifying herself in an email to Legacy's auditor as "Susan Fry, United Carpet Inc." She wrote on behalf of United that "we have contacted Accurate Flooring and told them of your request. The owner [identified as Gaetano Turi] is not a union company and states that he is not willing to have an audit done for that reason." (Ex. 15). Susan never revealed that she was the president of GNF (which relied on Accurate Flooring to provide all of its installers) and had not worked for United since 2008. (Tr. at 178, 185). The Trust Funds subsequently dropped their lawsuit seeking records from Accurate Flooring after learning from United's counsel that Accurate Flooring was no longer in business and United was going out of business as well. (Tr. at 65, 88). Yet just a few months later, Accurate Flooring merged with GNF and continued operations, and United remained in business serving as GNF's supplier of union labor.[23]

Considering the totality of the evidence, including witness credibility, the parties' arguments, and the applicable law, the Court finds that United and GNF were alter egos of each other and jointly liable for making fringe benefit contributions to the Trust Funds during the audit period. In so finding, the Court is cognizant of Defendants' arguments that the dramatic decline in union work after the 2008 market crash gave them no choice but to pursue non-union jobs to support the Desario and Turi families, and that their actions did not cause the union to lose business or money. (*See e.g.*, Tr. at 160-162;

---

[23] GNF also failed initially to respond to a request for payroll records and other financial documents as part of the July 2018 audit, resulting in a "No Audit No Cooperation" report dated May 2, 2018. (Exs. 12, 26). Ultimately, GNF records were provided.

Closing argument). What Defendants were unable to explain, however, is how these difficult circumstances bore on whether the two companies constituted a single employer or alter egos of each other, and if so, whether the terms of the Trust Agreements and Area Agreement required payment of benefit contributions for bargaining unit work done by their employees. Judgment is entered in favor of the Trust Funds on this claim.

## V. Award Sought by the Trust Funds

The Trust Funds seek $939,094.71 in unpaid fringe benefit contributions, $182,897.67 in interest, $187,818.94 in liquidated damages, and $6,175 in auditors' fees, totaling $1,315,986.32. (Exs. 28, 29). The Trust Funds also seek attorneys' fees and costs. The $939,094.71 figure comes directly from the 2018 Legacy audit, and is based on 30,645 hours worked by 13 employees for whom United had previously paid fringe benefits but who were paid during the audit period by GNF without benefit contributions. (Ex. 27, at 5-6, 13; Tr. at 138-44).[24] Defendants already conceded the accuracy of the 2018 audit in the summary judgment briefing.[25] Defendants failed to respond to facts about the audit (*see* Doc. 35-1), thus admitting they were true. *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 901 (N.D. Ill. 2014) (quoting *Banks v. Fuentes*, 545 F. App'x 518, 520 (7th Cir. 2013)) ("A litigant's failure to respond to a Rule 56.1 statement,

---

[24] These 13 employees were identified in footnote 4.
[25] Plaintiffs quoted the following language in their Local Rule 56.1 Statement of Undisputed Facts:

Legacy Professionals, LLP concluded that United Carpet, Inc.'s underpaid fringe benefit contributions for the period January 1, 2016 through December 31, 2017 in the amount of $939,094.71 based upon 30,645.00 hours worked by those employees for whom United Carpet, Inc. had previously paid fringe benefit contributions to the Trust Funds but who were paid during the audit period through Great Northern Flooring, Inc.

(Doc. 33, at 5-6 ¶¶ 9, 10; Stip. 78).

or to dispute the statement without 'specific references to the affidavits, parts of the record, and other supporting material,' results in the court's admitting the uncontroverted statement as true."). *See also Chicago Dist. Council of Carpenters Pension Fund v. Lovering-Johnson*, No. 98 C 7278, 2000 WL 983555, at *2 (N.D. Ill. July 17, 2000) (quoting *Sullivan v. Gill*, No. 97 C 446, 1999 WL 495494, at *3 n.4 (N.D. Ill. June 30, 1999)) ("[T]he auditor's findings 'are presumed accurate as a proper measure of delinquent contributions unless refuted'" by the defendants).

Further, Defendants failed to provide any probative evidence or argument in opposition to the accuracy of the audit figures at trial. Their primary argument was not that the hours recorded and resulting award amounts were incorrect but rather, even if the Court found United and GNF to be a single employer or alter egos of one another, there still was no basis for requiring payment of fringe benefit contributions for 9 of the 13 employees identified in the audit. More specifically, Defendants argued those 9 employees had ceased working for United long before the audit period. (Tr. at 27-28, 715) (Nino Test.). This is correct. United contribution reports indicate that the 9 employees last worked for United in 2012 or earlier. (Exs. 45, 46). Based on this, Defendants' position was that they should be required to pay (at most) contributions for bargaining unit work performed only by the remaining 4 employees: Peter Caucci, Pietro Desario, Mark Jones, and James Nelson. As noted, these four men worked for both United and GNF during the audit period. While contributions were made by United for the hours they worked on union jobs, GNF did not make contributions for their hours worked on non-union jobs.

Given the Court's conclusion that United and GNF were a single employer and alter egos of one another, however, Defendants were responsible for making contributions to the Trust Funds on behalf of all employees performing bargaining unit work by GNF during the audit period regardless of whether they had ceased working for United (and paying union dues) years earlier.

## **CONCLUSION**

For the reasons stated, the Court finds that during the relevant audit period from January 1, 2016 through December 31, 2017, United and GNF constituted a single employer and alter egos of one another such that they were jointly liable for making fringe benefit contributions to the Trust Funds. The Trust Funds are awarded $1,315,986.32, plus attorneys' fees and costs in an amount to be determined.

ENTER:

Dated: September 26, 2022

_____
SHEILA FINNEGAN
United States Magistrate Judge